Argued November 14, 1947; Reversed and Remanded June 8;
Petition for Rehearing Denied September 15, 1948

# MARNON *v.* VAUGHAN MOTOR CO., INC.
### 194 P. (2d) 992

In Banc.

*John C. Veatch,* of Portland, argued the cause for Respondent. On the brief were Veatch & Bradshaw, of Portland.

*Roy F. Shields, James G. Smith* and *Ralph R. Bailey,* of Portland, argued the cause for Appellant. On the brief were James G. Smith and McGuire, Shields & Morrison, of Portland.

**LUSK, J.**

This is a suit for an accounting of profits derived from the sale of certain machines known as "Mobile Load-Lift Trucks" or "Mobilifts".

The plaintiff Edward S. Marnon claims that he and the defendant Vaughan Motor Company, a corporation, were joint adventurers in the manufacture and sale of Mobilifts; that such joint adventure was created and evidenced by a contract in writing executed by the parties; and that the defendant has failed and refused to account to him for certain profits realized on the manufacture and sale of such machines during the years 1942 and 1943. The Circuit Court decreed that plaintiff was entitled to relief; that plaintiff was a joint adventurer with defendant "in the business of manufacturing and selling lift trucks and each entitled to a one-half interest in said business"; and, upon an accounting being taken, entered judgment for the plaintiff in the sum of $17,149.00 as the balance due on one-half of the profits for the year 1942, and the further sum of $95,550.00 as the balance due on one-half of the profits for the year 1943, and for plaintiff's costs and disbursements.

From this judgment and decree defendant has appealed.

The contract in question was executed by plaintiff and defendant under date of September 30, 1937, and reads as follows:

"THIS AGREEMENT, Made this 30th day of September, 1937, by and between VAUGHAN

MOTOR CO., a Corporation of the State of Oregon, hereinafter called Party of the First Part, and EDWARD S. MARNON, hereinafter called Party of the Second Part,

"WITNESSETH:

"That,

"WHEREAS, Party of the First Part is designing, inventing and will hereafter patent, if anything in connection therewith is found to be patentable, a certain mechanical device which is to be known as the 'Mobile Load-Lift Truck', the idea for which originated with Party of the Second Part; and

"WHEREAS, the experience of the Party of the First Part in regard to the manufacture and cost of said device is limited; and

"WHEREAS, the experience of the Party of the Second Part in the sale of said item is also an unknown factor; and

"WHEREAS, the Party of the First Part desires to manufacture said article, and the Party of the Second Part desires to market the same,

"NOW, THEREFORE, in consideration of the premises, it is agreed between the parties hereto as follows:

"1. Party of the First Part shall proceed with reasonable speed to develop the design for said Mobile Load-Lift Truck and shall thereafter promptly proceed with the manufacture of said article in such quantities as the sales thereof by the Party of the Second Part, or others, shall warrant.

"2. Notwithstanding the fact that the building of said Mobile Load-Lift Truck was suggested by Party of the Second Part, nevertheless, and it is distinctly understood and agreed between the parties hereto, the said Mobile Load-Lift Truck and the ideas embodied in the manufacture thereof shall be the sole and exclusive property of Party

of the First Part and Party of the First Part shall have the right to patent any ideas contained in said device and all improvements thereon insofar as said device and said improvements shall be patentable and said patents, if any, when so obtained, shall be the sole and exclusive property of the Party of the First Part.

"3. The manufacture of said article shall be at the sole cost and expense of Party of the First Part, and Party of the First Part shall not inform, divulge or extend to any other person, firm or concern whomsoever, the ideas or thoughts embodied in said device or the right to design or manufacture the same, nor sell or market the same to or with any person other than the Party of the Second Part, except upon the terms and conditions hereinafter set forth.

"4. When said device has been designed and manufactured, Party of the First Part shall, within a reasonable time thereafter, set and quote to Party of the Second Part the cost of said device, reserving unto itself a reasonable margin of profit thereon. When said cost price, plus said manufacturer's profit, has been definitely fixed, the Parties hereto will each one with the other agree, fix and establish a reasonable list or consumer's price, having in mind as part of said cost price and list price a reasonable margin of profit wherein the Party of the Second Part can sell said device at such a profit as the exigencies of the business demand.

"5. Party of the First Part shall, at its own sole cost and expense, keep all book accounts relating thereto and maintain such bookkeeping system as the business demands, and all purchase payments on the sale of said article are to be made directly to the office of the Party of the First Part and it shall make disbursements therefrom to the Party of the Second Part after the fixed and set price hereinbefore mentioned reserved to the Party of the First Part has been deducted.

"6. Notwithstanding the fact that it is the intention of the Parties hereto that Party of the Second Part shall have the exclusive right to sell and market said device, nevertheless, if the Party of the Second Part shall neglect to serve adequately any particular territory where there is a demand for the device, or if the Party of the Second Part voluntarily declines to market said device in any given territory, then the Party of the First Part shall have the right, upon notice to the other party of its intention so to do, to set up and maintain a system of marketing said device in said territories, it being the intention that all territory, wheresoever the same may be located and in which a demand for said device arises, shall be served. In any such territory so served by Party of the Second Part, Party of the First Part shall pay to Party of the Second Part a commission of two (2%) per cent of the dealer's price on all such devices sold in said territory, provided, however, that if Party of the Second Part shall abandon the sale of said device, then said commission of two (2%) per cent shall be paid only for a period of five (5) years from the date of such abandonment.

"7. The provisions of this contract shall be binding alike upon the heirs, executors, administrators and assigns of the parties hereto.

"IN WITNESS WHEREOF, the foregoing is signed by the Parties hereto, in duplicate, the day and year first above written.

"VAUGHAN MOTOR CO.
"By SAMUEL WEISS, Treas.
"By H. G. BOUTIN, Secretary.
"Party of the First Part.
"EDW. S. MARNON      (Seal)
"Party of the Second Part.

"In the Presence of:

_____
_____:''

## THE PLEADINGS

In his complaint the plaintiff alleges the following: In the year 1937 he "conceived the idea for the construction of a motor-driven hand truck with a motor-powered lifting device for the stacking and storing of boxes, crates and other containers of merchandise in warehouses and other storage facilities. That at said time the defendant was manufacturing and, as plaintiff was advised, owned the patent for, a device known as a 'reversing clutch' which plaintiff considered essential to the successful operation of the motor truck and lifting device he contemplated building. That plaintiff approached the defendant and revealed his plans for the construction of said motor truck and lifting device, using defendant's said reversing clutch in such construction, and proposed to defendant that they, the plaintiff and defendant, manufacture and market said machine."

Plaintiff then alleges the execution of the above contract, which is pleaded according to its legal effect and *in haec verba*.

It is alleged that immediately upon the execution of said agreement plaintiff and defendant started to work upon the development of plaintiff's ideas for the construction of said machine; that in 1939, 1940 and 1941 the defendant became the owner of various patents on the machine and alterations and improvements thereof; that a design containing the words "mighty midget mobilift" was registered in plaintiff's name in the United States Patent Office on June 27, 1939; that the coined word "Mobilift" was registered in

plaintiff's name as a trade-mark and trade name on December 3, 1940; and that

"during all of the times mentioned herein all of said machines manufactured by defendant have been manufactured under said patents issued and assigned to defendant, as aforesaid, and have been labelled, marketed and sold under said trade-marks owned by plaintiff, and all contracts made by defendant with agencies for the sale of said machines and with customers for the purchase of said machines have specified and designated said machines by the trade name so owned and held by plaintiff.

"That, on or about the first day of October, 1938, plaintiff and defendant had developed a machine which plaintiff considered adequate for the purpose for which intended and ready for market and plaintiff started to develop a sales organization and to promote the sale of said machines. That ever since said time plaintiff has devoted his whole time and efforts to the establishment of sales agencies and promoting the sales of said machines throughout the United States. That when plaintiff would establish an agency for the sale of said machines he would fix the amount of commissions to be allowed such agency and such agency would enter into a contract direct with the defendant and defendant would fix the sale price of said machines. That plaintiff took no part in the fixing of the sale price of said machines except in fixing the arbitrary sale price in 1938, as aforesaid, but plaintiff relied upon defendant to fix such sale price over and above such commissions as would allow plaintiff a reasonable margin of profit, as provided in said agreement. That the commissions paid by defendant on the sale of said machines were paid direct to the sales agencies. That plaintiff paid and agreed to pay no part of said commissions save and except in the case of one agency established to serve the territory in the trade area of the City of New York,

plaintiff agreed to pay such agency a sum equal to five (5%) per cent of the profits plaintiff realized from the sales made in such territory, in addition to the sums such agency should receive from said defendant."

In addition to promoting the sale of Mobilifts the plaintiff, it is alleged, at the request of defendant, arranged for the purchase of materials and parts to be used for the manufacture thereof, negotiated with Government agencies for the obtaining of, priorities for such purposes under the emergency war regulations; consulted with defendant on the organization and arrangement of defendant's manufacturing 'plant to speed the manufacturing of such machines; and generally worked with defendant to promote the common enterprise.

"That, on or about the first day of January, 1939, defendant informed plaintiff that it was unable to fix a cost price for the manufacture of said machines and could determine such cost price only from experience and proposed that plaintiff and defendant set an arbitrary figure as the sale price of said machines and that plaintiff accept eight (8%) per cent of such sale price in lieu of his reasonable profit as specified in said agreement and that a cost price be fixed according to the terms of said agreement when defendant should be able to determine such cost, to which proposal plaintiff assented."

Thereafter, until the end of the year 1941, defendant accounted to plaintiff each year for a sum equal to eight per cent of the sale price of machines sold during such year as follows: For 1939—$2,000.00; for 1940—$3,000.00; for 1941—$25,000.00. At the end of 1939 defendant informed plaintiff that it had not been able during the year to segregate its costs of manufacturing

Mobilifts from its other factory costs and requested plaintiff to continue on the same basis during the year 1940, which plaintiff agreed to do. At the end of 1940 defendant told plaintiff that, due to changes which had been made in the construction of the machines, its cost of manufacture was uncertain and asked plaintiff to continue another year on the same basis, which plaintiff agreed to do. At the close of the year 1941

"defendant informed plaintiff that he, the plaintiff, was making too much money, that the agreement they had been working under was of no value and that defendant could pay plaintiff any sum it desired and that it would not pay to plaintiff any sum in excess of four (4%) per cent of the sale price of said machines.

"That defendant has failed, neglected and refused to inform plaintiff of the cost price of said machines or to set a reasonable profit on its manufacturing cost of the same and has failed, neglected and refused to set a sale price with plaintiff which would allow plaintiff a reasonable margin of profit, according to the terms of said agreement, but on the contrary defendant has at all times set the sale price of said machines and ever since the first day of January, 1942, has claimed and now claims that plaintiff has no interest in the manufacture and sale of said machines, but is merely a sales agent of defendant, and defendant has failed, neglected and refused and now refuses to account to plaintiff for any profits realized on the manufacture and sale of said machines for the years 1942 and 1943, save and except that defendant has credited to plaintiff on its books a sum equal to four (4%) per cent of the sale price of said machines for said years."

The prayer is as follows:

"1. That defendant be required to account to plaintiff for its manufacturing costs for said ma-

chines for said years, and for the amount of profits it received on the manufacture and sale;

"2. That the court fix a reasonable profit to be allowed defendant on the manufacturing cost of said machines for said years and a reasonable profit to be allowed plaintiff on the sale of the same;

"3. That plaintiff have judgment against defendant for the amount of profit decreed plaintiff for said years, over and above said four (4%) per cent credited to plaintiff as aforesaid;

"4. That plaintiff have such other and further relief as to the court may seem equitable and just."

In its amended and supplemental answer the defendant alleged that prior to September 30, 1937, plaintiff suggested to it a need and market for a small self-propelled truck for use in transporting packaged goods in and around warehouses and similar places, and that thereupon it proceeded to experiment with and subsequently designed a truck, which, however, was and is quite different in design, structure and function from that suggested by plaintiff. "After defendant had so designed such truck, plaintiff represented to it that he had available financial resources amply sufficient to purchase and market said device, to establish sales agencies and to sell, develop orders for the same in quantities sufficient to permit defendant to manufacture and dispose of the same at a profit to it." It is alleged that in reliance upon such representations the defendant executed the contract of September 30, 1937, but that plaintiff did not have nor was he able to obtain financial resources with which to purchase machines which defendant had commenced to manufacture or to set up sales agencies for that purpose, and that he did not do so; and that, because of plaintiff's failure in that regard, "said agreement of Sep-

tember, 1937 was cancelled and terminated effective as of the first day of January, 1939." Thereafter, it is alleged, defendant proceeded to manufacture and market the machines, and employed plaintiff to act in general charge of the market and sale thereof throughout the United States and otherwise to render services to defendant. For such services plaintiff was to receive the sum of eight per cent on the net sales price of each machine sold by defendant, and out of such eight per cent plaintiff was to bear certain costs and expenses. This arrangement continued until January 1, 1942, at which time plaintiff's commission was reduced to four per cent. The defendant entered into a contract with the Mobilift Company of New York under which the latter bought trucks to be resold in certain territory and as to such sales plaintiff and defendant agreed that plaintiff's commission should be no greater than three per cent of the net sales price to defendant. All transactions between plaintiff and defendant prior to January 1, 1939, were settled on or before that date. Each year, commencing with the year 1939, defendant furnished plaintiff with a statement of his account with the defendant, showing net commissions earned and moneys paid by plaintiff to defendant or for his account. From January 1, 1939, to March 6, 1944, plaintiff's gross commissions amounted to approximately $228,472.81, and defendant paid to plaintiff or for his account the sum of $224,421.37, said sums including the adjustments and corrections for said period. Defendant is and at all times has been ready, able and willing to account to plaintiff for the transactions involved.

A further and separate answer relates to facts developed on the trial, and charges in substance that the plaintiff, in violation of his duty as its agent, was paid,

pursuant to a secret agreement and without the knowledge of the defendant, a portion of commissions paid by the defendant to its agent in Washington, D. C., for his services in making sales of Mobilift trucks to the Government of the United States and its various departments, bureaus and agencies. The defendant alleged that all such secret profits belonged to it and prayed that the plaintiff be ordered to account to defendant therefor.

The court entered detailed findings of fact and conclusions of law which included as a finding of fact the following:

"The Court finds that there was never any agreement between the parties for the cancellation of the contract and further finds that, on January 1, 1939, the method of dividing profits as set forth in the contract was suspended and from that date there was never a meeting of minds between the parties as to their respective interest in the profits."

The conclusions of law are as follows:

"I

"That the written contract between plaintiff and defendant is valid and enforcible.

"II

"That said contract creates a joint adventure between plaintiff and defendant in the business of manufacturing and selling lift trucks and each of said parties have an equal interest in said business.

"III

"That said contract was not cancelled by the agreement between the parties on January 1, 1939, but the provisions therein relating to their respective interest in the profits from said business were suspended.

## "IV

"That, during the years 1942 and 1943, the parties operated said business without any agreement between them as to the division of profits and the profits should be divided equally."

The court made no express finding of fact or conclusion of law on the question whether the moneys received by Marnon under his agreement with the Washington agent constituted "secret profits". In the accounting, however, the court determined the amounts so received for the years 1942 and 1943, and included them among the moneys to be divided equally between the parties as profits of the joint adventure.

## THE EVIDENCE

A summary of the material facts is as follows: Mr. Marnon for many years has been a salesman of industrial machinery. In 1937 he was employed in that capacity by Howard-Cooper Corporation, of Portland. He conceived the idea of a small lift truck machine which could be used for picking up and transporting packaged goods in places where the space was limited, such as warehouses and freight sheds, or, as he expressed it in his testimony, "a small machine that was capable of working almost anywhere, running into trucks, heavy trailers, into box cars, working on and off trailers". A lift truck he described as "a machine that runs around under its own power, has something out in front that runs under the load, lifts that load up, and sets it down again." As finally developed, the Mobilift is a truck with two wheels in front and a caster in the rear, an elevator consisting of a pair of forks in front, which are power-operated, for picking up loads, and a small step or platform

in the rear on which the operator stands. Four different models were built, the largest capable of lifting and transporting a load weighing 2,000 pounds.

At the suggestion of Mr. D. I. Cooper, president of the Howard-Cooper Corporation and who was also vice president of the Vaughan Motor Company, Marnon presented his idea to the representatives of the latter company, which manufactured machinery, for the purpose of interesting it if possible in the development and manufacture of such a lift machine as he had in mind. Vaughan had no sales department. Marnon discussed the matter with Hiller Boutin, the secretary, and Samuel Weiss, the vice president of Vaughan. Boutin was in charge of the corporation's office, the "correspondence and financial end" of the business, while Weiss was at the head of its engineering and production department. They became interested in Marnon's idea to the extent that Vaughan proceeded with the making of designs and experimental models, and by the latter part of 1937, probably in October, had manufactured a complete machine. Considerable testimony was taken upon the question whether the device which Marnon suggested was a two-wheel hand truck to be propelled by a gas engine, as Vaughan contends, or a power-driven lift truck such as was ultimately designed and built. Vaughan has argued this contention here, but we are of the opinion that the question is foreclosed by the recitals in the contract that the idea of the "Mobile Load-Lift Truck" "originated with" Marnon, and that "the building" of it "was suggested" by him—this being the very machine which at the time of the execution of the contract had, as Vaughan asserts and we find, been designed and almost completely built.

Marnon seems to have made efforts in various directions to enlist capital to finance the sale of the machine. Among other projects was the organization of a sales corporation by Marnon and Roy Nelson of the Howard-Cooper Corporation, Marnon to assign his contract to the proposed corporation. This having failed, Marnon informed Boutin that he had made arrangements with Howard-Cooper to take over the sale of the truck with Marnon in charge, and, at Marnon's request, Boutin in August, 1938, obtained from Howard-Cooper an order for twenty machines. Marnon testified that he was entitled to a two per cent profit on these machines, as called for by his contract, but the evidence is all but conclusive that Marnon asked Boutin to add $20.00 to the price of each machine sold to Howard-Cooper and to credit him with the sum, and that Boutin agreed to do so. Vaughan's books, which are in no way impeached, show that credit was given Marnon in accordance with the agreement. These machines were delivered to Howard-Cooper and some of them resold, but, owing to a dispute that arose because of a claimed mechanical deficiency, the deal was cancelled and the trucks returned. By this time Vaughan had expended more than $50,000.00 in the development and manufacture of Mobilifts. Marnon then left the employ of Howard-Cooper, and, according to Boutin's testimony, told Boutin that he had money enough to last until the first of the year—this was about November 1, 1938—, and suggested that he go out in the Pacific Northwest and sell machines on the same basis as the sales to Howard-Cooper, and that at the end of the year they would make a new arrangement. Boutin acquiesced, and during the last two months of 1938 Marnon made a few sales directly to consumers, receiving as his profit the difference

between the manufacturer's price and the retail or list price. These transactions were handled on Vaughan's books by crediting Marnon with the list price and charging him with the manufacturer's price.

In the meantime he and Boutin discussed plans for marketing the machine. Marnon testified: "I suggested that I go out for a trial year to prove what could be done." On or before January 1, 1939, they agreed upon a method of operation. They mapped the country out into five or six different territories in each of which a dealer was to be established by Marnon. Marnon was also to break in a man in each territory—referred to as a "block man"—to work with the dealers, instructing them in the sale and servicing of the machines. It would be Marnon's duty to select the dealers, and if Vaughan, after investigation, found them acceptable, it would enter into dealer's contracts with them. An amount equal to eight per cent of the purchase price received by Vaughan on all machines was to be paid to Marnon, and, as Marnon was without funds and so informed both Boutin and Weiss, Vaughan agreed to advance him $700.00 a month for traveling and living expenses including the expenses of his family, against which such eight per cent was to be credited. Except for advertising, the eight per cent was to cover the entire cost of selling, including the pay of block men. Advertising, it was estimated, would cost four per cent of the sales price. They fixed a retail sales price, and agreed that the machines should be sold to dealers at a discount of twenty-five per cent off the retail or list price, and parts at a discount of thirty-five per cent.

Marnon went East early in 1939 and established dealers in Chicago and other large eastern cities. After Marnon had made the preliminary arrangements with

the prospective dealer the latter would enter into a contract with Vaughan. An exception to this procedure was in the case of Mailler-Searles of San Francisco, with whom Vaughan entered into a contract appointing that concern its Pacific Coast dealer over Marnon's objection. Marnon did not see the Mailler-Searles contract.

As nearly as we can determine, the first time after January 1, 1939, that Marnon asserted rights specifically under the written contract of September 30, 1937, was in the summer of 1940 when both Marnon and Boutin were in Chicago. A dispute had arisen between two dealers over the division of the discount when one dealer sold a truck which was delivered in the territory of the other. Boutin undertook to settle the dispute, and in a discussion of the matter with Marnon, according to Boutin's testimony:

"* * * we finally came to where it sounded as though he was telling me the company didn't have any right to talk to their own dealers, and I asked him if that is what he meant, and he said yes, we didn't have any right to. I asked him how he figured that and he said 'Read your contract.' I said 'What contract? We haven't got any contract.' He said, 'The old contract.' I said, 'Well, we are not working under that contract and you know it.' And when I came back here I took up the contract and took it over to Mr. Maguire (Vaughan's attorney) and related this conversation in Chicago. He asked me if, when we had made the change, if there had been anything in writing and I told him no. He said, 'Well, then, it will be one man's word against the other.' I said, 'Well, if it ever comes to a case in court, this contract would get into it then, wouldn't it?' He said, 'Yes.' I says, 'What does it mean and how would a court view it?' And he gave me his opinion on it."

Boutin was not asked, and did not testify, about the contents of the opinion.

In January, 1941, the Chicago dealership was discontinued and in its place Vaughan, with Marnon's full approval, established a factory branch in that city. All expenses of the branch were borne by Vaughan and all commissions of salesmen working out of the branch were paid by it. Marnon described the branch in his testimony "as just another dealer", and it was credited with the same discount as ordinary dealers. Both during the course of the business and as a witness, Marnon conceded that he was not entitled to any part of the "profits"—as distinguished from his eight per cent compensation—on trucks sold through the Chicago branch. He explained that what he meant by "profits" were the dealer's discounts and service charges earned by the Chicago branch.

In the latter part of 1941 Marnon and Boutin discussed the desirability of discontinuing dealerships and setting up factory branches, like the Chicago branch, in their stead. Marnon favored this plan, and it seems to have been agreed upon. Marnon conceded that he was not to participate in the profits of any of the branches.

A dealer's contract was entered into about the middle of 1939 with the Mobilift Company of New York, which was given exclusive distributing rights in eastern New York and certain other eastern states. Marnon, on Boutin's suggestion, got in touch with the men who organized this company and they came to Portland, where the contract was entered into, both Boutin and Marnon participating in the negotiations. Owing to certain special advantages that this dealership offered, a discount of thirty-seven and one-half per cent was allowed instead of twenty-five per cent

as in other cases. Marnon agreed that on sales made to the Mobilift Company of New York he would forego five per cent of his eight per cent compensation, while Vaughan was to contribute the remaining seven and one-half per cent to make the additional twelve and one-half per cent discount. On July 11, 1938, Marnon had applied to the United States Patent Office for registration of a trade-mark containing the words "Mighty Midget Mobilift", which was registered on June 27, 1939. Subsequently he registered the single word "Mobilift" as a trade name. He testified that he coined the word as a contraction of "Mobile Load-Lift Truck", and that he gave the organizers of the Mobilift Company of New York permission to use the name. This name was stamped on all trucks manufactured by Vaughan and was used by it on its letterhead and advertising of the machine. The contract of the Mobilift Company of New York was cancelled by Vaughan in February, 1942, and as a result that company sued Vaughan in the United States District Court for the District of Oregon and recovered a judgment for breach of contract.

In the latter part of 1940 Marnon went to Washington and arranged for the sale of some twenty trucks to the Procurement Warehouse, a government agency. In January, 1941, he engaged a man named Larry Cain to establish himself in Washington as the Mobilift representative to secure government contracts. From that time on, due to the fact that this country was preparing for war, with the consequent adoption of the system of governmental priorities on essential materials, Mobilift sales were made in increasing volume to the government and its various agencies, while sales to private individuals dwindled. As will be seen, sales to the government developed into a very large

and profitable business. Cain was not a dealer, but an agent working on a commission of fifteen per cent on sales. Dealers into whose territory machines sold to the government were shipped, were allowed a service charge of ten per cent. This ten per cent arrangement applied likewise to the Chicago branch. Eventually, as will appear, this evolution into what became practically a one-customer business led to cancellation of all dealers' contracts, and thereafter Vaughan set up its own service organization, furnishing men to the office of the Quarter Master General for general service purposes. Marnon, according to his testimony, hired the men, but their salaries were paid by Vaughan.

Marnon paid all expenses in connection with the setting up of this Washington agency, and was very active in promoting the government business. Without Vaughan's knowledge Marnon entered into an agreement with Cain by which Cain was to pay him fifty per cent of his commissions. The facts about this secret agreement did not come to light until the trial of the case, and, as a result of the disclosure, the defendant filed an amended and supplemental answer in which it claimed that Marnon was under a duty to account to it for all moneys received by him under such agreement.

The record contains an extensive correspondence between Marnon and Boutin, covering the period from June, 1941, to June, 1942, relative to difficulties encountered in securing priorities, and the need of plant expansion and speeding up of the manufacturing process in order to fill the rapidly increasing government orders. This correspondence is discussed in a section of Vaughan's brief under the head "Marnon's Claim that Vaughan Would Make No Effort to Obtain Sufficient Materials to Keep the Plant Going." Unless the

subject matter of the correspondence has a bearing on the contention of Marnon that he and Vaughan were joint adventurers, it must be regarded as irrelevant to any issue in the case.

A dispute between Marnon and Boutin concerning dealers' discounts developed out of the government business. At first all government buying was centered in Washington, but later it became apparent that it was to be decentralized, and, as a result, sales would be made to various agencies of the government in a territory where a Mobilift dealer had exclusive rights under his contract with Vaughan. Thus a question arose as to whether in an instance of that kind Cain or the dealer was entitled to the commission or discount. In March, 1942, Boutin submitted to Marnon a copy of a letter which he proposed to send to Cain confirming the arrangement which Marnon had made with Cain for the payment to the latter of a fifteen per cent commission, but containing this sentence:

"While all dealers have been requested to not solicit government agencies for Mobilift business, they may occasionally make an isolated sale and in any such case, we do not assume responsibility for payment of the above mentioned commission to you."

Marnon, in a letter to Boutin, objected to the inclusion of this language in the letter to Cain because of "the position that it would place Cain in", and continued:

"Write all dealers as follows:

" 'From and after 30-60? days from the date hereof, your sale contracts on Mobilift shall be modified and amended to provide a discount of 10% rather than 25% on all sales to Government Agencies'."

On April 18, 1942, Boutin wrote to Marnon enclosing a copy of a letter Boutin had sent to the dealers and which read as follows:

"There is some possibility that the purchases of Government equipment will be decentralized so that the various Depots and Branches will be given the authority to negotiate the purchase of their own equipment at least in certain instances. Therefore, we find it necessary to notify you that after June 1st the discount allowed on all sales to all Government Agencies will be 10% rather than 25% regardless of whether the contract is negotiated through you or direct with us."

Boutin also informed Marnon in this letter that he "was not going to write the letter to Cain eliminating that one paragraph until after we see what reaction we get from the letter to the dealers." He took the position that they had entered into contracts with the dealers before the agreement with Cain was made and that the dealers were entitled to be protected, and, further, that, since the war would end sometime, they should look to the future and so conduct the business as to have dealers when peace came and government business had ceased. Marnon objected vigorously in a letter dated April 29, 1942, saying, in reference to the letter which Boutin had sent to the dealers:

"First, let me say that wasn't what I told you to write. I said nothing about telling the dealers that there was a possibility Government purchase(s) would be decentralized. I wrote you an exact quotation which, if you had mailed it to the dealers, would have been a short and just as conclusive a method of canceling their present contract and (as?) writing a new one, which would leave you everyway in the clear."

His letter concluded:

"If I must tell Cain that I made an agreement with him (which I cannot back up), then, naturally, that places me in a position where it will be necessary for me either to voluntarily withdraw from Mobilift or depend upon the courts to establish my authority.

"Now, since you and I both agree that this latter procedure is going to be costly to both of us and the only ones who would benefit would be the lawyers and we decide(d) to leave it to your attorney and mine to adjust, then, in the interim and until such adjustment is made, why don't you cooperate with me by assuming that I know what I am doing and agree to the decisions and agreements that I make and not cause all of the confusion and embarrassment which is occasioned by your continually upsetting the apple cart?"

(The decision "to leave it to your attorney and mine to adjust" refers to the dispute which arose at the end of 1941, related below and which led to this litigation.)

The upshot of the matter was that the dealers' contracts were canceled—whether because Vaughan was persuaded of the correctness of Marnon's position or because of the fear of litigation referred to in Marnon's letter it is impossible to say.

We go back now to the end of the year 1939. Marnon finished his first year's work of establishing dealers "$2,000.00 in the red". He testified that at the end of 1939 he asked Boutin about the cost of the machine "because that was the way that I had in my mind that we were going to set it up and the actual basis upon which we were going to perform", and that Boutin told him there was no way to establish the cost since the Mobilift business hadn't been kept separate

from Vaughan's other business. No new arrangement was made in 1940, and "they just went ahead on the same basis for another year". In 1940 Marnon's net earnings amounted to about $3,000.00. At the end of that year he again, according to his testimony, brought up the question of the cost of building the machine, and Boutin told him that they did not have a cost because they had been out of production for several months during the course of the year. The sales for 1940 amounted to approximately $191,000.00. The business was carried on in 1941 without any new understanding and Marnon was paid eight per cent, as theretofore. His net for that year was about $25,000.00. About the first of the year 1942, according to Marnon, he again asked Boutin about establishing a cost price and Boutin said:

"* * * that his board of directors had taken cognizance of the fact that the business was getting to be pretty big, they were becoming interested in it, and that they were going to take some definite action at their annual meeting, which was to be held some time in the first part of the year. He intimated that they had some grief in store for me."

Boutin, on the other hand, testified that Marnon asked him many times for cost figures, and that he refused to give them because "we considered it confidential information and we refused to give it to anybody." He denied that in asking for this information Marnon had referred to the written contract.

Boutin's testimony regarding the conversation which Marnon said took place about the first of the year 1942 is to the effect that he knew that Marnon's rate of commission was going to be cut and that he was trying to tell him so; that the discussion lasted

all day and into the evening; and that the substance of it was that Marnon thought that the company had no right to cut his commission.

> " * * * I thought he was talking about he still wanted 8%, but after several hours it developed that he was talking about the principle of the matter rather than the rate of commission; that we didn't have any right to set his commission at all, and I contended that he was no different than anybody else; that the company could set his remuneration or discharge him or do anything else, the same as they could with me."

Marnon denied that the company had that right, Boutin testified, and asserted "that he had an interest in the truck that was above that of an employee or of an agent, or anything else; it was something tangible in the machine itself." At another point in his testimony Boutin stated, apparently as a reason for cutting Marnon's commission, that by the beginning of 1942 Vaughan had practically only one customer and that was the government. They did not want to establish any more dealers since they had nothing to sell them, and "that his (Marnon's) original job temporarily didn't exist."

After the meeting between Marnon and Boutin at the end of 1941 above described Marnon went back to Chicago, and while there received from Boutin a letter dated January 23, 1942, informing him that Vaughan had come to the conclusion "that the rate (of Marnon's commission) should be reduced to four per cent in view of the fact that the objective in mind at the time the original rate was determined could not be reached or even furthered under the conditions as they exist today." Marnon called Boutin on the phone and threatened to bring suit, but on reflection, fearing the

adverse effects of litigation on the business, suggested to Boutin that they try to settle the controversy by arbitration or otherwise. Boutin acceded to this suggestion, and they continued to do business with the question of Marnon's right undetermined. After January 1, 1942, as Marnon testified, the business was carried on in essentially the same way as before the dispute arose.

Under date of January 29, 1942, Boutin, in a letter to Marnon regarding their differences, which, he said, related only to remuneration, wrote:

"In the absence of any special consideration no one is for long going to pay a great deal more to one person for a given commodity when they can or think they can buy the same commodity from someone else. In our particular case, I contend that there is no special considerations and you take the opposite viewpoint. If there is a valid contract in effect then you are right—if there is not, then I am right."

During 1942 the parties and their attorneys met several times in an effort to bring about an agreement, but none was reached.

In 1942 and 1943 the Mobilift business grew to very large proportions. In 1942 Vaughan's net profits, before taxes, were $146,084.00, and in 1943 $461,452.00. Marnon's commissions credited to him by Vaughan at the rate of four per cent amounted to $46,929.00 for 1942 and to $96,811.00 for 1943. In addition, as the Circuit Court found, he received from the Washington agency under his agreement with Cain for a division of commissions, $30,649.00 for the year 1942, and $88,146.00 for the year 1943.

On March 31, 1944, Marnon filed this suit, and on April 10, 1944, Vaughan wrote him, "Your relations as

an employee and representative of this company are hereby terminated as of this date."

LUSK, J.

This suit was brought upon the theory that the written contract of September 30, 1937, with all its provisions intact, remained in effect from the time of its execution throughout the entire period of the dealings between the parties. The complaint shows this to be so. It alleges that defendant has "refused to set a sale price with plaintiff * * * according to the terms of said agreement", and the prayer is for an accounting of profits in accordance with such terms. Counsel for the plaintiff repeatedly during the trial asserted that the contract was never modified, and in this court has argued the case upon that premise. Thus, in the plaintiff's brief, it is said:

"The suit involves primarily the construction of a written contract which we claim, and the trial court found, creates a joint adventure. If this court does not so construe the contract, the other issues involved in this appeal are of no importance."

Counsel for the defendant, on the other hand, have contended strenuously, not only that the contract does not create a joint adventure, but that it was wholly abandoned and that Marnon was a mere employee of the defendant and, therefore, not entitled to maintain a suit for an accounting of profits.

For our part we think that the concession of counsel for Marnon that, if the contract is not one of joint adventure no other question is important, is a concession that need not have been made and which the court should not accept. For, if the contract remained in effect either in its entirety or sufficiently so as to afford the basis for relief under the pleadings, it would

seem to us to be immaterial to the question of plaintiff's right to an accounting whether the relationship between the parties created by it was that of joint adventure or something else, since "whatever their relation may have been, their rights and liabilities rest upon their agreement, and where a contract provides as this one does, for payment by one party to another of profits received, it is the duty of the one receiving such profits to account to the other * * * " *Elliott v. Murphy Timber Co.*, 117 Or. 387, 393, 244 P. 91, 48 A. L. R. 1043.

We cannot, however, concur either in the view of the plaintiff that the contract was not modified in some important particulars, or in that of the defendant that it was cancelled or abandoned. It is our opinion that, as a result of the agreement of January, 1939, and the conduct of the parties under it, certain of the provisions of Paragraphs 4 and 5 of the contract relating to the method of transacting the business and the profits to which the respective parties were entitled were superseded, but that the provision of Paragraph 4, which, as we construe it, was intended to assure to Marnon a reasonable profit on the sale of Mobilifts, was never abandonded and remains as a basis for the maintenance of a suit for an accounting. We proceed to a consideration of the reasons which have led us to these conclusions.

## CANCELLATION OR ABANDONMENT OF THE CONTRACT

Vaughan contends that the sole consideration moving from Marnon for the contract of September 30, 1937, was Marnon's representation that he was amply financed and his promise to establish a sales agency which could market Mobilift, and that upon his failure

to comply with this promise Vaughan was wholly relieved of its duties under the contract. Reliance is placed upon § 318 of the Restatement of the Law of Contracts, which reads in part as follows:

"* * * any of the following acts, done without justification by a promisor in a contract before he has committed a breach under the rules stated in §§ 314-315, constitutes an anticipatory repudiation which is a total breach of contract:

"(a) a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties;

* * *

"(c) any voluntary affirmative act which renders substantial performance of his contractual duties impossible, or apparently impossible."

See, *Ratcliffe v. Union Oil Co. of California,* 159 Or. 221, 77 P. (2d) 136.

In order to discuss this contention intelligently it is necessary first to examine the terms of the contract. It recites that the idea of the "Mobile Load-Lift Truck" originated with Marnon; that Vaughan's experience in regard to the manufacture and cost of the machine is limited and Marnon's experience in its sale unknown. "In consideration of" these premises the parties agreed that: (1) Vaughan shall proceed to develop the design for the machine and thereafter to manufacture it in such quantities as sales of it by Marnon shall warrant; (2) notwithstanding that "the building of said Mobile Load-Lift Truck was suggested by" Marnon, the ideas embodied in it shall be the exclusive property of Vaughan, as also any patents upon it or upon improvements thereon; (3) the manufacture of

the machine shall be at Vaughan's sole cost and expense and Vaughan shall not divulge to any other person the ideas embodied in it nor give any other person the right to design or manufacture it, nor sell or market it to or with any person except Marnon except upon the terms and conditions thereinafter set forth; (4) within a reasonable time after the machine has been designed or manufactured Vaughan shall set and quote to Marnon "the cost of said device, reserving unto itself a reasonable margin of profit", and when said cost, plus manufacturer's profit, has been definitely fixed, the parties will agree upon and establish a reasonable list or consumer's price, "having in mind as part of said cost price and list price a reasonable margin of profit wherein (Marnon) can sell said device at such a profit as the exigencies of the business demand"; (5) Vaughan shall keep the books at its own expense, and all payments made in the purchase of machines are to be made directly to Vaughan "and it shall make disbursements therefrom to (Marnon) after the fixed and set price hereinbefore mentioned reserved to (Vaughan) has been deducted;" (6) if Marnon shall either neglect to serve adequately or shall voluntarily decline to market the device in any given territory Vaughan shall have the right, upon notice, to market it in such territory, it being the intention that all territory, where there may be a demand for such device, shall be served; but Vaughan shall pay Marnon two per cent of the dealer's price on all machines sold by it in such territory. If Marnon shall abandon the sale of the device said commission of two per cent shall be paid only for a period of five years from the date of such abandonment. The provisions of the contract are expressly made binding upon the heirs, executors, administrators and assigns of the parties.

Taking the contract by its four corners and viewing it in the light of the situation of the parties at the time it was drawn and executed, we think that its primary and central purpose was to grant Marnon the exclusive right to sell Mobilifts in consideration of the "idea" which the latter had originated and imparted to Vaughan. While there is language in Paragraph 4 which seems to indicate that Marnon was to buy machines from Vaughan—and no doubt he had that right—he was not required to do so. The provisions of Paragraph 3 that Vaughan will not "sell or *market* the same to or *with* any person other than" Marnon, etc., and the provision of Paragraph 5 that all purchase payments shall be made to Vaughan which will disburse to Marnon all above "the fixed and set price",—that is, its manufacturer's price—sufficiently show that it was anticipated that Marnon was to secure retail purchasers rather than buy and sell machines. This no doubt would have to be accomplished through some sort of sales organization or through the establishment of dealers. Vaughan's profit under the contract was limited to the difference between its cost of manufacture and its manufacturer's price. Marnon's profit was to come from retail sales, and it was stipulated that the parties would agree on a retail price which would enable Marnon to make a reasonable profit. That, we think, is all that the rather involved language of the second sentence of Paragraph 4 comes to. While not expressly stated, it is necessarily implied, that the entire expense and the full responsibility and risk, as well as all the profit connected with the retail sales of Mobilifts was to be Marnon's. The contract is not notable for good draftsmanship and it omits many details ordinarily to be found in agreements of that character. But, whatever

the relation between the parties created by it, it is akin to the exclusive sales agency contract and the exclusive sales and distribution contract frequently employed in modern industry, concerning which it is said in 4 Williston on Contracts (Rev. ed.) 2848, § 1027A:

> "Any one of these types of agreement, however, since they are bilateral in nature, imposes weighty obligations on both sides during its continuance. Usually, the agent or buyer, as the case may be, is doing more than merely offering to render services or to pay the price for the goods. It is at least expected and understood, and, in fact, frequently expressly provided in the contract, that he is to make a substantial investment and to build up or maintain a business establishment for the distribution of the manufacturer's products. On the other hand, the manufacturer intrusts the fate of his product in the defined territory exclusively to this agent or distributor, and, in thus forbearing to resort to other sources of distribution in that locality, he gives up a valuable right."

Finally, to protect Marnon in case of his inability to market the device in a given territory, or at all, the provisions in Paragraph 6 for a two per cent commission to be paid to him were included in the contract.

■ *First.* We pass over the contentions of the plaintiff that the parol evidence rule bars Vaughan from showing that it was induced to execute the contract by Marnon's representations as to his financial resources and ability to establish a sales organization, and shall assume, although we do not decide, that such evidence was admissible. Our examination of the testimony does not convince us of the factual validity of this claim. If Marnon did make such representations to Boutin and Weiss before the contract was executed, as they

testified and he denied, we do not think that they regarded them as anything more than the tall talk of a high-powered salesman. It was Boutin who conducted the negotiations with Marnon and agreed upon the terms of the contract with him, although Weiss was present at some of their discussions. As the record clearly discloses, Boutin is a cautious, prudent, clearheaded business man, not likely to be taken in by claims such as he testified Marnon made. These were to the effect that a group of men connected with the United States National Bank in Portland were prepared to put up a half a million dollars for the formation of a sales company. Boutin does not seem to have been too sure that the representations were made before the contract was executed because, when asked about this, he testified:

> "I think that the original mention of this group I just mentioned was prior to the time that I signed this contract."

That he was skeptical appears from the following statement in his testimony:

> "I couldn't quite see what they were going to do with all that money, and mentioned it, and he said that it was going to cost a lot of money to do it."

Mr. Boutin testified that he knew what Marnon's financial position was, because he had investigated it. We think that if the decision as to whether he should sign the contract or not depended upon the existence of financial backing for Marnon, he would likewise have investigated that subject. The name of the man who was supposed to head the group who were going to put up a half a million dollars as well as the names of others whom Marnon hoped to interest in the enter-

prise were given him, and he would have had no difficulty in ascertaining the facts.

Again, on his direct examination, Boutin's attention was called to Paragraph 5 of the contract under which it was agreed that Vaughan should keep the books relating to the business and that all purchase payments should be made directly to Vaughan, which was then to disburse to Marnon that portion of the moneys to which he was entitled. He was asked why that clause was put in the contract and answered:

> "A Well, our information was that Mr. Marnon didn't have finances to finance a deal like that and we didn't know how long it would be before we had machines nor how long before he would have his selling organization, and we expected that we would have machines before he would be ready. If they were sold, we wanted to handle the accounts so that we would get our money first."

This answer is inconsistent with the idea that Boutin thought that Marnon would have a sales organization formed by the time that Vaughan had built machines ready to be marketed. It leaves wholly unsupported the argument, advanced for the first time in Vaughan's reply brief, that Marnon breached the contract in 1938 when he advised Vaughan of his financial inability to establish a sales agency and undertook to sell Mobilift machines for the remainder of that year at retail. And it renders inapplicable the rule of the Restatement, and of the Ratcliffe case, above cited.

Of even greater significance is the contract itself—both in respect of what it contains and what it omits. The contract was drawn by Vaughan's attorney, and we think that if the representations in question were

made and relied on, Boutin would have seen to it that they were incorporated in the writing.

The provision of Paragraph 6 that if Marnon "shall abandon the sale of said device" Vaughan may take over the sales, and Marnon in that event will be entitled to a commission of two per cent of the dealer's price on all machines sold for a period of five years from the date of such abandonment is, in our opinion, wholly out of harmony with the defendant's position. It shows that, so far from Vaughan relying on the asserted promise of Marnon, the parties had in mind the contingency that Marnon might never sell a machine, and provides what the respective rights of the parties should be if that contingency should arise.

■ But, it is argued, this provision means only that if Marnon, after having created an initial demand for the machine, should decide not to market it in a particular territory or should be unable to do so, he was to receive two per cent on machines sold in such territory by Vaughan to compensate him for his efforts. We think that Marnon's rights are not thus limited and that the contract will not bear that interpretation. Having been prepared by Vaughan's attorney, any uncertainty of its meaning must be resolved in favor of Marnon. *Herrold v. Hartley,* 144 Or. 368, 24 P. (2d) 338. But we think that the contract, so far as this question is concerned, is free from ambiguity. It may be conceded that the parties contemplated that Marnon would establish a sales organization or find some other means of marketing the machine, for he could not otherwise earn the profit provided for in Paragraph 4, but he did not obligate himself to market Mobilift.

There are three contingencies stated in Paragraph 6, on the happening of any one of which the two per

cent provision would come into effect. The first applies to a particular territory "where there is a demand for the device" and which Marnon shall "neglect to serve adequately"; the second applies to "any given territory" in which Marnon shall "voluntarily decline" to market the device; and the third to an entire "abandonment" of its sale by Marnon. In the first two instances, apparently, the commission is to be paid as long as machines are sold by Vaughan in the territories referred to; in the last it is to be paid for a period of five years only after such abandonment. The word "abandonment" was used, in our opinion, to express Marnon's voluntary decision at any time, either before or after entering upon a selling program, to quit the enterprise. It cannot be given the construction urged by counsel for Vaughan without reading into the provision language which the parties have not seen fit to insert, and certainly not without adopting a construction in favor of the party who drew the instrument.

■ *Second.* What, then, was the consideration for the agreed two per cent commission, and, as well, for the exclusive selling rights granted to Marnon? Obviously, it was the "idea" of the device, which the contract states "originated with" Marnon and was "suggested" by him to Vaughan. A careful reading of the contract reveals that it does not bind Marnon to do anything except to agree with Vaughan, as a basis for determining his profits on any machines he might sell, on a list price of the machines after Vaughan had fixed its manufacturer's price. It gives Marnon exclusive selling rights, a portion of the profits on sales made by him, and, under certain stated conditions, a two per cent commission on sales made by Vaughan. Many a

man has had a valuable idea from which he has received no financial reward but which others have used to their profit. The purpose of the provision under discussion was to safeguard Marnon's interests and to assure him a measure of compensation for his idea if it should prove to have value, even though he might never earn a cent of profits as a salesman. In this instance, as it turned out, the idea had great value, and we think that Marnon should not be deprived of its legitimate fruits by what seems to us to be an afterthought on the part of the officers of Vaughan as to what influenced them to sign the contract.

The defendant asserts, however, that the "idea" of the "Mobile Load-Lift Truck", which, according to the recitals in the contract, originated with Marnon, could not have been the consideration for the contract because at the time of its execution one machine had been nearly completed, and, therefore, whatever "suggestions" Marnon may have made to Vaughan must have been made before the contract was executed. While no principle of law is invoked and no authorities are cited in support of this claim, we assume that what counsel have in mind is that Marnon's "suggestions" to Vaughan were in the nature of a gratuity, which would not constitute consideration for a contract subsequently entered into.

We think that the contention is answered by the rule, supported by a considerable body of authority and recognized in the decisions of this court, that when "the past consideration consisted of a material pecuniary benefit which, although not moved by a previous request, was conferred upon the promisor in such circumstances as to create a moral obligation and has not been exhausted by furnishing the consideration

for another legal obligation already performed or still enforceable, * * * it will support a subsequent executory promise." 12 Am. Jur., Contracts, 601, § 107. The cited text continues:

"To render this doctrine applicable it must appear: (1) That the service or other consideration moving from the promisee conferred an actual material or pecuniary benefit on the promisor, and not merely that it resulted in detriment to the promisee; (2) that the promisee expected to be compensated therefor, and did not intend it as a mere gift or gratuity; (3) that the circumstances were such as to create a moral obligation on the part of the promisor; and (4) that the benefit received has not constituted the consideration for another promise already performed or still legally enforceable. * * *" See, also, 17 A. L. R. 1325, 79 A. L. R. 1349

This doctrine has received the express approval of this court in the following cases: *State ex rel v. Funk,* 105 Or. 134, 161, 199 P. 592, 209 P. 113, 25 A. L. R. 625; *Meyer v. Livesley,* 56 Or. 383, 389, 107 P. 476, 108 P. 121; *Forbis v. Inman,* 23 Or. 68, 72, 31 P. 204; *Glenn v. Savage,* 14 Or. 567, 577, 13 P. 442.

It is clear from the record in this case that Vaughan derived a material and very substantial pecuniary benefit from Marnon's idea; that Marnon did not intend to confer a gratuity on Vaughan, but rather expected to be compensated; that imparting the idea to Vaughan created a moral obligation which Vaughan recognized in signing the contract; and that no other promise or obligation was involved. The contract, therefore, and Vaughan's undertakings therein, are supported by a valid consideration. The contract was not cancelled or abandoned. We pass to the question of its modification.

## MODIFICATION OF THE CONTRACT

■ As related in the statement of the evidence, about January 1, 1939, the parties agreed orally upon a method of transacting business. The reason for making that agreement is not far to seek. It developed out of the necessities of the situation. In 1938 Marnon was hopeful that the Howard-Cooper Corporation would be the medium through which an organization for nationwide sale of Mobilifts might be developed. When this hope was disappointed Marnon quit Howard-Cooper's employ and undertook by his personal efforts to sell a few machines. The division of profits, or rather of the proceeds of the sales during this period, was in accordance with the provisions of the written contract, that is to say, Vaughan retained its manufacturer's price, Marnon got all the rest. It was obvious, however, that no business of the volume necessary for the success of the enterprise could be built up merely through sales made by Marnon individually. Moreover, Marnon, being without funds and unable to obtain financial backing, could neither buy machines himself nor, unaided, establish a sales organization throughout the country. In other words, he was unable to proceed in the manner contemplated by the contract. On the other hand, Vaughan, having invested in excess of $50,000.00 in designing and building the machine, was under the business necessity of finding a means of marketing its product, recouping its investment, and making a profit.

It was under these circumstances that, during the last two months of 1938, Boutin and Marnon, with Weiss at times participating, engaged in discussions about the terms of a new arrangement for marketing

Mobilifts. The result of these discussions was the agreement of January, 1939, under which Marnon, financed by Vaughan, was to establish sales agencies in various sections of the country and be paid eight per cent of the price received by Vaughan for all machines sold.

This agreement was widely different from the provisions for a division of profits in the written contract and comprehended a different method of transacting the business. Vaughan's duties under the contract were to manufacture Mobilifts, "set and quote" to Marnon its manufacturer's price, agree with Marnon on a retail price which would allow for a reasonable profit to Marnon, sell the machines to Marnon or his sales organization or dealers appointed by him, keep the books, receive the purchase price, and disburse to Marnon his part thereof—i. e., all above the manufacturer's price. It is clear, and there is no contention to the contrary, that Vaughan had no obligations connected with the sale of Mobilifts other than as above stated.

Vaughan did not agree to finance Marnon or defray advertising costs by the contract of September 30, 1937. But by the agreement of January, 1939, it not only assumed these burdens but as well the risk of loss connected with them. In the place of the agreement for the division of the proceeds of sales under which Marnon was to receive all above the manufacturer's price, he agreed to accept eight per cent of the price received by Vaughan, and Vaughan agreed to pay this whether there were profits or not. For the purposes of the present discussion it is immaterial whether, as Marnon contends, this eight per cent should be called "costs of sale", or is referred to as a "commission",

"compensation", or something else. By whatever name it may be called it was in fact the only remuneration Marnon received while that agreement was in effect, and it amounted to about $25,000 in the year 1941.

The trial judge found that the provisions of the written contract relating to the respective interests of the parties in the profits were "suspended." Counsel for Marnon take issue with this finding and say that by the January, 1939, agreement "the only thing the parties decided on was how the respondent's share should be expended." It is contended that the parties agreed that forty-six per cent of the retail sales price was Marnon's "share" and that this should be allocated twenty-five per cent to the dealer, four per cent to advertising, and eight per cent to the cost of sales, to be credited to Marnon. Even on that theory the arrangement would represent a modification of the contract because there remained nine per cent, which, according to a statement of Marnon's, was the compensation to Vaughan for the "gamble" it agreed to take when it financed him. If forty-six per cent of the retail sales price was Marnon's share under the written contract, his agreement to take less than forty-six per cent resulted to that extent in a different and inconsistent agreement.

We are unable, however, to accept the premise that "the only thing the parties decided was how the respondent's share should be expended." This was not an agreement for the sharing of profits. The percentages the parties talked about were not money in the bank. The respondent's "share" when the agreement was made was theoretical and not in existence. While the twenty-five per cent discount to the dealer was not given and the eight per cent allowance to Marnon was

not credited, until after the actual receipt of the money produced by sales, the advertising expense could not wait on the receipt of such money, but in the beginning at least would have to be incurred before sales were made and in order to create a demand for the product. In other words, Marnon's "share" included the cost of advertising, which, under the contract, was his burden, but which, under the new agreement, was assumed by Vaughan. So, also, Vaughan was required to advance $700.00 a month to Marnon whether his efforts produced results or not. True, these advances were to be credited back, but it was possible that a part or all of them would be lost to Vaughan. It was also possible that the money spent on advertising would be lost. That was the "gamble" that Vaughan took. It was not provided for in the contract.

It is our opinion that the agreement of January, 1939, amounted to a modification of the written contract, under which Marnon sold machines and established dealers for their sale, at a fixed rate of compensation of eight per cent of the price received by Vaughan on all sales except those made by the Mobilift Company of New York, upon which his agreed rate of compensation was three instead of eight per cent.

This conclusion is reenforced, indeed made inevitable, by the establishment of the Chicago branch. This was done with Marnon's full approval and cooperation, and the conduct of the parties in that regard was inconsistent with those terms of the contract which contemplated that Vaughan's interest in Mobilift was to be limited to the manufacture of the machine and the profit from its sale to Marnon or his dealers, and that all else belonged to Marnon. The branch was financed and operated by Vaughan. Its employees were

Vaughan's employees. They sold Mobilifts and serviced them. In a word, Vaughan became, as far as the Mobilift business was concerned, not merely a manufacturer, but a sales organization selling machines at retail on which Marnon was paid a commission of eight per cent.

In 1942 the Chicago branch did a large business. Its total purchases of Mobilift trucks, parts and materials for sales to its customers amounted to $367,073.00. Of that amount the sum of $288,067.00 represented purchases from the Vaughan factory. In 1943, when most of the sales were to the government, the branch was credited with dealer's discounts in the amount of $34,683.00, in which were included ten per cent of the sale price of machines sold to the government through the Washington agency and thirty-five per cent discount on parts. All the profit in these figures concededly belonged to Vaughan. No part of them belonged to Vaughan under the contract, because they were not a part of, but in addition to, "the manufacturer's profit" to be included in the "cost price" which Vaughan was to "set and quote" to Vaughan—the only profit which, under the terms of the contract, Vaughan was entitled to make.

The radical departure from the provisions of the contract is emphasized by the following excerpt from a letter written by Marnon to Boutin under date of January 16, 1942, in which he was discussing the Chicago branch:

"Except for the fact that unusual conditions prevail we will probably go ahead with the plans which you and I discussed while I was in Portland and which involve several other set ups just like this, all of which will be factory owned. I do not

want at this time to do anything that may create the impression that at some future date this branch will be operated as dealership by either Mr. Putnam or myself, both of us together, or by anyone else. This is now and will remain your branch as will the other branches that are set up by yourself. At the time when we can set up those other branches undoubtedly it will be necessary to rearrange our policies of operation but these changes in policy would tend to knit our organization closer together into a more compact, centrally controlled unit rather than to do the opposite."

It was the position of the plaintiff in the court below, and it is his position here, that, according to the evidence, the defendant received as profits for the years 1942 and 1943, some $230,000.00 arising out of sales where no dealer's discounts were given, the sum in question representing the amount of such unpaid discounts; that this profit pertained exclusively to the sales end of the business, which belonged to Marnon; and that Vaughan should account for the full amount thereof. The contention, it will be observed, rests squarely upon the terms of the written contract.

The argument supporting it was stated very clearly by counsel for the plaintiff during the course of the taking of testimony on the accounting. A question having been raised as to the theory of the accounting, counsel for the plaintiff said:

"Now, your paragraph 4 of the contract, with which the court is familiar, sets up the method of dividing profits. It provides for two profits; it provides for a profit for the manufacturing end of the business and it provides for a profit for the selling end of the business. The factory alone is to set the factory cost, including a margin of profit. Then the two of them are to set a sales cost which

would allow a margin of profit. Now, the plaintiff has no interest whatsoever in the manufacturer's profit; the manufacturer had no interest whatsoever in the sales profit. They were separate and distinct. That is a provision of the contract. Now, that is the way the parties construed the contract.''

Counsel for the plaintiff then referred to a statement made by Boutin in a conference held by the parties and their attorneys in an attempt to settle the controversy in June, 1942. Referring to the sales in 1938 to Howard-Cooper Corporation, Boutin had said: ''We arrived at a price and when we were to be paid that price, and then we were to be through with it.'' Plaintiff's counsel next quoted from Boutin's testimony concerning the sales made by Marnon in 1938 after he left Howard-Cooper as follows:

''Well, when we shipped a machine to a customer we charged Mr. Marnon with the—with his cost of the machine, and when the customer paid for the machine we credited his account with the payment received from the customer.''

In this connection counsel referred to a sale to the Grays Harbor Chair & Manufacturing Company and the exhibits in evidence with regard to such sale, which showed that the method described by Boutin had in that instance been followed, and proceeded:

''* * * According to its terms, according to the way the parties construed it, and according to the way they operated under it, the contract provided for separate and distinct profits. The manufacturing profit went to the factory. The price, the factory price, was set by the Vaughan Motor Company. Marnon had nothing to do with it. The two of them set the sale price. Now, everything over and above the manufacturer's price went to the sales end of the business. That is the way the contract reads;

that is the way the parties construed it; that is the way the parties actually operated under it."

Counsel then argued that no change had been made in the contract by the January, 1939, agreement. The construction thus placed on the contract by Marnon's counsel at the trial is adhered to by his counsel in this court.

In connection with the foregoing contention, it should be noted that precisely the same sort of claim was made by Marnon in the year 1940 during the course of the transaction of the business. The evidence concerning it was brought out on Marnon's cross-examination. He conceded at first that under the January, 1939, agreement he was to be credited with only eight per cent of the amount of money received by Vaughan and that he was entitled to no part of the profits. On cross-examination his attention was called to correspondence passing between him and Boutin in 1940 concerning two sales which were made without the intervention of a dealer and on which Vaughan received the full retail price without reduction for dealer's discount. In this correspondence Marnon asked to be credited with the amount of the dealer's discount. Boutin refused to allow this claim. He wrote Marnon under date of April 22, 1940:

"I have reference to your contention that the difference on any sale between the dealers price and the amount actually received by us, should go to your credit. That is a swell idea from your standpoint but not from ours; we originally agreed that the maximum sales cost would not be more than 8%, that also has proved to be the minimum but under present circumstances that cannot be helped. However, we have assumed any and all liabilities actual or potential and as long as we get all the

grief, we are also entitled to any gravy when there is some.''

Again, Marnon at one time suggested to Boutin that Vaughan should stand a part of the expense of a convention at which Marnon was promoting the sale of Mobilifts. In declining to accede to this suggestion Boutin wrote Marnon under date of February 5, 1940, a letter in which he said among other things:

"* * * It is my impression that you look at it that we are making certain equipment to order that you then take it and then pay a specified price and carry on from there. *That was the original idea but not the one that we were forced to proceed under.* As the proposition turned out, it is no different than anything else that we are making.'' (Italics added.)

Concerning these matters Marnon testified on cross-examination:

"Q Why, if your deal was that you were to receive 8% for the things that you were to do during the year 1940, were you claiming that you were entitled to any more than 8%?

"A My deal was not that I was to receive 8%. My deal was that I was to receive a fraction under 37%, of which I was to give 25% discount to the dealer, 4% for advertising, and leaving the balance to me. I have explained all that to you now six or seven times.''

Being pressed further about the apparent inconsistency in his testimony, he said:

"A In addition,—what I said was that in addition to the 25% that we were going to give the dealer—now, that is established; that wasn't changed—the 4% for advertising; I thought I made myself clear on this. The 25% and 4% was fixed and they weren't ever changed. Now, in addition

to that, then—that was money that I couldn't spend; the dealer got the 25, the advertising company got 4—then in addition to that I had agreed that my costs would not exceed 8%. It wasn't even 8% of the cost, of the retail price, but I had agreed that my cost would not exceed 8% of what they got net."

At another point in his cross-examination Marnon admitted that he had not made any arrangement which entitled him to any part of the unpaid dealer's discount.

■ In connection with these matters, Marnon's counsel argue that Vaughan knew in 1940 that Marnon claimed rights under the contract, and invoke the principle that, where one knows that another is acting under the belief that he has certain rights and accepts the benefits of that action, he cannot be heard to question its validity (citing *Smith v. Martin*, 94 Or. 132, 185 P. 236). We do not see how that principle can come to Marnon's aid. If Vaughan knew that Marnon was asserting the rights in question, Marnon equally knew that Vaughan denied them. There was nothing equivocal about Vaughan's position. It did nothing to mislead Marnon into believing that Paragraphs 4 and 5 of the contract were then in effect. It rejected his claim to a share in the profits beyond the eight per cent agreed on in January, 1939, and called his attention directly to the terms of that agreement. It reminded him in February, 1940, that they had been forced to proceed in a different manner than the "original idea", namely, "that we are making certain equipment to your order, that you then take it and pay a certain price and carry on from there"—which was precisely the "idea" embodied in the written contract. It is certainly of no little significance

that Marnon made no answer to this statement and that he continued thereafter until 1942 to accept the eight per cent. When the dispute over the control of dealers arose in the summer of 1940, and Marnon brought up his rights under the contract, Boutin told him, "well, we are not working under that contract and you know it." Again, in May, 1941, Marnon claimed that Vaughan rather than he should bear the expense of sending a man to Florida. As shown by the correspondence between Marnon and Boutin on this subject, both parties based their contentions on the terms of the 1939 agreement as they understood them. In any case, as to the years directly involved, there can, of course, be no claim that there was any misunderstanding on Marnon's part as to Vaughan's position. The parties started out in 1942 with full knowledge of each other's contentions, and continued to transact the business for the next two years in complete awareness of the risk they each ran that, if they should be unable to compose their differences, a court would some day determine their respective rights and obligations.

One difficulty about this claim to the entire amount of the unpaid discounts is that they were not net profits to Vaughan, for it is shown without contradiction, and nowhere is disputed, that Vaughan's advertising expense and its expense of keeping men in the field and servicing machines sold to the government are not taken into account in the computation.

The more serious objection, however, goes to the entire contention, and, therefore, to the whole theory of the plaintiff's case. The expenses referred to were incurred, not in connection with the manufacture of Mobilifts, but with their sale to consumers. It could

not be said of these sales, as Boutin said of the 1938 sales, "We arrived at a price and when we were to be paid that price, and then we were to be through with it." Instead, Vaughan had a continuing responsibility with respect to these sales, which, under the construction placed on the contract by both parties, it was not required to assume. The way "the parties actually operated" in 1942 and 1943 is not the way they actually operated in 1938. It would be a somewhat remarkable result for a court to hold that under such circumstances there had been no change in the terms of the contract.

We think that the fallacy underlying the contention of the plaintiff lies in the unexpressed assumption that the case must be viewed in the same light as though Marnon had made the January, 1939, agreement with a third party instead of with Vaughan. In that event, of course, it would have been no concern of Vaughan's what arrangement Marnon might have made for a distribution of responsibility, expense, and profits in connection with the retail sale of Mobilifts. But, when he dealt as he did with Vaughan, he dealt with the subject matter of their contract, and any agreement they made which was inconsistent with its terms necessarily modified the contract to the extent of the inconsistency. He could not agree with Vaughan that the latter should assume responsibilities and incur expense in the business of selling Mobilifts at retail, and at the same time maintain the integrity of a contract under which, according to the plaintiff's own construction, Vaughan's duties were limited to the manufacture of Mobilifts and selling them to Marnon or to whomsoever Marnon might designate.

■ ■ The plaintiff urges that there was no consideration for the alleged modification. This court ad-

heres to the rule that there must be a consideration in such cases. *Craswell v. Biggs,* 160 Or. 547, 560, 86 P. (2d) 71; *Cameron v. Edgemont Investment Co.,* 149 Or. 396, 403, 41 P. (2d) 249. In the present case Vaughan's promise to finance Marnon and defray advertising costs, and the burdens that it subsequently assumed in connection with the retail sales of Mobilift, all constituted a valid consideration within the meaning of the decisions cited.

■ There still remains to be considered on this branch of the case the question: How far did the modification go? Specifically, did it wipe out the provisions of the contract which contemplated that Marnon should receive a reasonable profit on sales made by him? That question is certainly not one free from difficulty. The alternative is to hold, as the defendant contends, that Marnon became a mere employee whose compensation Vaughan could fix, and whom it could discharge at will. This conclusion should not be drawn unless the evidence is so strong in support of it as to leave room for no other.

■ We have said that the evidence of the parol modification of a contract "must be clear, convincing and conclusive". *Craswell v. Biggs,* supra. The rule is thus stated in 17 C. J. S., Contracts, 869, § 379:

> "An agreement, when changed by the mutual consent of the parties, becomes a new agreement, which takes the place of the old, and consists of the new terms and as much of the old agreement as the parties have agreed shall remain unchanged; in other words, a contract may be abrogated in part and stand as to the residue. The new contract supersedes the first to the extent that the two will be unable to stand together."

In the Restatement, Contracts, § 408, it is said:

"A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract. The parties may or may not at the same time agree to rescind all the other provisions of the earlier contract. Whether they do this is a question of interpretation, except as this rule is qualified by the rule stated in § 223."

See, also, *Krause v. Bell Potato Chip Co.*, 149 Or. 388, 392, 39 P. (2d) 363; 13 C. J., Contracts, 595, § 615; 6 Williston on Contracts (Rev. ed.) 5172, Note 9.

With reference to the question of what conduct will constitute modification of a contract it is said in 4 Page on the Law of Contracts 4357, § 2458:

"While the parties to a contract may modify it by a subsequent contract which is shown by their acts, the acts which are relied upon to modify a prior contract must be unequivocal in their character. Acts which are ambiguous in their character, and which are consistent either with the continued existence of the original contract, or with a modification thereof, are not sufficient to establish a modification.

"Conduct which is not necessarily inconsistent with the continuation of a contract, will not be regarded as showing an implied agreement to discharge it, although such conduct might have been consistent with an agreement to discharge such prior contract."

And it is, of course, well established that the minds of the parties must have met upon the asserted modification, 17 C.J.S., Contracts, 1229, § 558; 13 C. J., Contracts, 762, § 950; *Northwestern Fire and Marine Insurance Co. v. Connecticut Fire Insurance Co.*, 105

Minn. 483, 117 N. W. 825; *Molostowsky v. Grauer,* 113 N. Y. S. 679.

At the end of 1938, when Marnon, due to lack of funds, was unable to proceed with a selling program, it is possible that Vaughan would have been justified in taking the position that he had abandoned the sale of the machine and in setting up its own system of marketing under Paragraph 6 of the contract, with no obligation to Marnon other than to pay him two per cent of the proceeds of the sales for a period of five years. Instead of doing this, however, it chose to enter into the agreement of January, 1939. There is no evidence that in their discussions the parties mentioned Marnon's exclusive selling rights or Vaughan's covenant not to disclose the principle of Mobilift to others. In fact, there is no evidence that the contract was mentioned at all. The continued existence of the provisions just referred to was entirely consistent with the terms of the new agreement, and neither of them can be said to be discharged because of that agreement. To hold otherwise would be to run counter to the principles of law upon this subject to which attention has been called above. The agreement to pay Marnon eight per cent of the sales price for marketing the machines was not a permanent agreement. All the evdience shows that it was a year-to-year arrangement. It could be renewed at the end of a particular year only by mutual consent, and there finally came a time when Vaughan refused to renew it, and asserted the right to fix Marnon's compensation and to discharge him if he refused to accept Vaughan's terms.

The contract of September 30, 1937, contemplated a business to be transacted over a period of, perhaps, many years, and the parties, under the pressure of

circumstances, might well have entered into the oral agreement without intending that it was to endure longer than the circumstances which brought it about. That, indeed, is the only view which harmonizes with the retention by Marnon of his exclusive selling rights under the written contract. We are of the opinion that the minds of the parties never met on an agreement which would have rendered those rights of doubtful value. We therefore hold that, while, for reasons already stated, Marnon may not insist on the enforcement of the provisions of Paragraphs 4 and 5 of the contract to their full extent, he did not relinquish his right to a reasonable profit on sales of Mobilift, and that such right simply remained in abeyance during the years 1939, 1940 and 1941, and thereafter was in force and effect, but circumscribed by the new conditions created by the parties themselves.

■ The "reasonable profit" to which Marnon is entitled is limited to profits derived from the sales of Mobilifts to consumers, including the United States government. He is not entitled to share in the manufacturer's profit. Counsel for Marnon do not defend the Circuit Court's conclusion of law "that said contract creates a joint adventure between plaintiff and defendant in the business of manufacturing and selling lift trucks and each of said parties have an equal interest in said business." Counsel for Marnon say in their brief:

"The trial court's decree is based upon an equal division of the profits. This is predicated on the court's finding that the parties did not have a definite understanding about the division of profits after the meeting of January 1, 1939. We are unable to see how a contract can be amended by a misunderstanding but we accepted the trial court's

finding as we realized that the development of the government business eliminated the necessity for some expenditures the respondent would have had under normal operations and due to the fact that the business will have to be wound up and an accounting had for subsequent years.''

We concur in this criticism of the conclusion of law above quoted, and we can see no basis for giving Marnon any part of the manufacturing profits, as distinguished from profits derived from retail sales. The contract, as construed by the parties themselves, makes no such provision either in its original or its modified form. It is said that our law ''does not surprise parties into a partnership against their will''. *Call v. Linn*, 112 Or. 1, 7, 228 P. 127; *Preston v. S. I. A. C.*, 174 Or. 553, 564, 149 P. (2d) 957. Yet, to hold that Marnon and Vaughan were partners in the manufacture of Mobilifts would be to do that very thing. In 1942 Marnon was a witness in the suit brought in the Oregon Federal Court against Vaughan by the Mobilift Company of New York. We quote some of the answers given by him to questions put to him touching his authority to represent the Vaughan Motor Company. ''We are two entirely separate entities. The authorities of the Vaughan Motor Company are just as definite as mine and I have not now, never have had, never represented that I should or could speak authoritatively for the Vaughan Motor Company on any question whatever.'' ''For instance if there was a question between Mobilift of New York and the Vaughan Motor Company regarding credit, regarding payment of bills, regarding manufacturing, those things were in the province of the Vaughan Motor Company and I had nothing to do with them. If it came to a question of sales, then I decided the sales

policy of Mobilift. The Vaughan Motor Company does not. Now, any controversy that anybody ever had with me was over sales policy, not anything else. I merely am the sales end of Mobilift. I sell Mobilifts." "The Vaughan Motor Company made machines. I sold them." "I have nothing whatever to do with the Vaughan Motor Company other than take the machines they make and sell them."

We do not quote these answers as being strictly and in all respects accurate, for even as to matters falling within the category of sales policy, Marnon, while exercising very wide powers, was not supreme. Dealer's contracts, for example, were not Marnon's contracts, but were entered into by Vaughan and the respective dealers, and no one but Vaughan had authority to terminate them. But this aside, his sworn testimony shows that Marnon did not consider himself a partner in the business of manufacturing Mobilifts. His suit was not brought on that theory, his counsel made no such claim on the trial, and, as stated, do not defend it here. There is nothing in the record to indicate that such a partnership had ever entered into the thinking of the officers of the Vaughan Motor Company. In the detailed findings of fact made by the circuit judge there is none which suggests it. About all that there is in the record which would afford any sort of a basis for a contention of this kind is the evidence briefly referred to in the statement of facts regarding the obtaining of priorities and the need of plant expansion and speeding up of the manufacturing process in order to fill the rapidly increasing government orders. We think it sufficient to say of this evidence that it does no more than reflect the extraordinary conditions created by the war and the unusual activities in which

business men and others were forced to engage during that period. In a situation where the problem was not one of selling goods but finding them, Marnon, in order to promote his own business of selling Mobilifts, might well have exerted himself to secure priorities and needed materials, and might even have made the suggestions to Vaughan which he did make—and which usually were not heeded—concerning manufacturing methods, without thereby becoming a partner in the business of manufacturing Mobilifts.

## CLAIM THAT CONTRACT IS TOO INDEFINITE FOR ENFORCEMENT

█ Counsel for the defendant have argued with vigor and at length that the provisions of Paragraph 4 of the contract that the parties will "fix and establish a reasonable list or consumer's price, having in mind as part of said cost price and list price a reasonable margin of profit wherein the Party of the Second Part can sell said device at such a profit as the exigencies of the business demand" are too indefinite for enforcement because they comprise an agreement to make an agreement in the future and because there has been no meeting of the parties' minds on what constitutes a reasonable margin of profit.

As stated by Professor Williston in a passage quoted by the defendant in its brief:

> "A provision that some matter shall be settled by future agreement has often caused a promise to be too indefinite for enforcement." 1 Williston, op. cit. 98, § 37.

An illustrative case upon which the defendant relies, among others, is the recent decision of this court in *Reed v. Montgomery*, 180 Or. 196, 175 P. (2d) 986.

The parties there had executed a writing by which they purported to agree to pool their properties, consisting of logging equipment, "to carry on business therewith". There was no further indication in the writing of the character of the business except that one of the parties agreed to advance $1,500.00 to secure an extension of an option on timber land. The writing concluded:

"It is understood that this is a temporary agreement further details to be included in a more particular agreement to be later drawn up between the parties."

The more particular agreement was never drawn up nor were the further details ever agreed upon; it was not shown that any business was ever transacted under the alleged contract; and it was therefore held that the writing was incomplete and not a contract, and that plaintiff's suit for an accounting of profits derived from a logging operation carried on by the defendant must fail.

The principle invoked by Vaughan governed that case, but we apprehend it can have no application to a case where the parties have actually agreed on the matters which their writing left to the future and the agreement, as thus completed, has been fully executed and large profits realized which are now in the hands of one of the parties. This, the evidence shows, is the state of the present case.

■ As to the language "a reasonable margin of profit" defendant relies upon the rule thus stated in 1 Williston, op. cit. 98, § 37:

"It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning."

In the Restatement, Contracts, § 32, the rule is phrased thus:

"An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."

There are authorities cited in Williston, idem. 117, § 41, and referred to in the defendant's brief, which tend to support its position. Of these the case most closely in point is *Gaines & Sea v. R. J. Reynolds Tobacco Co.,* 163 Ky. 716, 174 S. W. 482, where the price to be paid for a quantity of tobacco was agreed to be the original cost thereof plus the expense of handling and a "nice" or a "reasonable profit". The court held the contract unenforcible because of the difficulty of determining judicially what would be a reasonable profit.

The peculiar difficulties inherent in the task of determining a reasonable profit on a sale of tobacco were dwelt upon by the court and undoubtedly influenced its decision. This court in *Edwards v. Tobin,* 132 Or. 38, 284 P. 562, 68 A. L. R. 152, thought it within judicial competency to enforce specifically an agreement in a lease giving the lessees an option of renewal at its expiration, with a provision that at the time of renewal the rental should be determined by the parties, "said rental to be a reasonable rental under the then existing conditions"; although it must be conceded that in so far as that decision enforced an agreement to agree in the future, it represents the minority view. See 1 Williston, op. cit. 133, note 4. More nearly like the instant case is *Noble v. Joseph Burnett Co.,* 208 Mass. 75, 94 N. E. 289. The decision was upon demurrer to the complaint, which alleged an

agreement by the defendants to pay one Markoe (plaintiff's intestate) or his legal representative "a fair and equitable share of the net profits realized by the sales of flavoring extracts and coloring matters for foods manufactured" under certain processes and formulas to be discovered by the said Markoe. The suit was for an accounting of profits realized by the defendants in the sale of such flavoring extracts and coloring matters. The Supreme Judicial Court of Massachusetts reversed a decision of the lower court which sustained the demurrer. The court said:

"But it is contended by the defendants that the agreement is too indefinite to be enforced. In support of this contention they argue that what is a fair and equitable share of the net profits cannot be determined and hence the plaintiff can have nothing. The allegations of the bill show that this work was done by Markoe not gratuitously, but under a promise to receive a portion of the proceeds. The work has been done and the bill alleges that great profits have accrued, and the only thing to be done is for the defendants to pay over a fair and equitable share thereof. The plaintiff does not call upon the court to state the rule in accordance with which the profits already obtained and now in the hands of the defendants shall be divided. The contract itself states the rule—a fair and equitable share. The plaintiff simply asks that this rule shall be applied not to future probabilities but to past facts. There is nothing to show that the rule is so indefinite or that its application is so impracticable that it cannot be applied with reasonable certainty to the circumstances under which the profits were made."

The court took the same view of the question in the somewhat similar case of *Allan v. Hargadine-McKittrick Drygoods Company,* 315 Mo. 254, 286 S. W. 16.

■ These decisions appeal to us as sound and as more conformable to equitable principles than one which would deny the plaintiff all relief. It is the duty of courts to give effect to contracts entered into by parties in good faith, and pursuant to which they have acted, if it can be done reasonably and without violating settled legal principles. See 1 Williston, op. cit. 100, § 37. This is especially true in a case like this where one of the parties, in carrying out the contract, has concededly rendered valuable services which redound to the enrichment of the other. We say "concededly" because it is expressly admitted in the record that Marnon's efforts were responsible for acquiring the government business which produced most of the profits. We are of the opinion that the standard fixed by the contract here can be reasonably applied to the facts and that it should be done.

■ While, from the standpoint of legal draftsmanship the phrase "as the exigencies of the business demand" may be subject to the strictures upon it found in the defendant's brief, we think its inclusion in the contract is of very little consequence. The contract would have had no different meaning if the phrase had been omitted or if some such language as "under the circumstances" had been used. It would be a necessary implication of such an agreement that the parties would take into consideration, in addition to the manufacturer's cost, all the factors such as costs of sales, probable demand, general market conditions, etc., which ordinarily would be in the view of a manufacturer in establishing a list price. It was matters of this kind that, we think, the parties had in mind in using this phrase.

We conclude, therefore, that, at least in a suit

such as this, brought to compel an accounting of profits already earned under a contract fully executed as to such profits, the objection of indefiniteness cannot be sustained.

## THE WASHINGTON AGENCY SECRET PROFIT

█ The agreement between Marnon and Cain, Vaughan's Washington agent, under which Marnon received half of Cain's commissions, was concededly made and carried out without Vaughan's knowledge. The law frowns upon such transactions. Concerning them it is said in 1 Mechem on Agency (2d ed.) 894, §§ 1224 and 1225:

"The well settled and salutary principle that a person who undertakes to act for another shall not, in the same matter act for himself, results also in the other rule, that all profits made and advantage gained by the agent in the execution of the agency belong to the principal. And it matters not whether such profit or advantage be the result of the performance or of the violation of the duty of the agent if it be the fruit of the agency. If his duty be strictly performed, the resulting profit accrues to the principal as the legitimate consequence of the relation; if profit accrues from his violation of duty while executing the agency, that likewise belongs to the principal, not only because the principal has to assume the responsibility of the transaction, but also because the agent cannot be permitted to derive advantage from his own default.

"It is only by rigid adherence to this rule that all temptation can be removed from one acting in a fiduciary capacity, to abuse his trust or seek his own advantage in the position which it affords him.

"It matters not how fair the conduct of the agent may have been in the particular case, nor that the principal would have been no better off if the

agent had strictly pursued his authority, nor that the principal was not in fact injured by the intervention of the agent for his own benefit. The result is still the same.''

See *Dias v. Favell-Utley Realty Co.*, 126 Or. 227, 232, 269 P. 207; *Schmidt v. Wirth,* 99 Or. 261, 266, 195 P. 375; *Thimsen v. Reigard,* 95 Or. 45, 55, 186 P. 559.

Again, it is said in Mechem, op. cit. 898, § 1227:

"So, where a purchasing agent secures from those with whom his principal dealt, commissions in consideration of buying goods from them, the principal is entitled to recover from the agent the amount of the commissions thus received.''

■ To the same effect, see 3 C. J. S., Agency, 55, § 165:

''An agent violates his duty by secretly entering into relations or transactions concerning the subject-matter of the agency in which he has interests adverse to those of his principal.'' *U. S. Shipping Board Emergency Fleet Corp. v. South Atlantic Dry Dock Co.,* 300 Fed. 56, 61.

■ These principles are well established and have been applied in a wide variety of cases. It seems hardly necessary to do more than state the proposition that, in entering into the secret agreement with Cain, Marnon acquired ''interests adverse to those of his principal.'' His conduct, above recounted, in taking Cain's part, when the controversy arose with Boutin over the rights of dealers outside of Washington, may readily have been influenced by a desire to protect his own interest in the Cain commissions. But, whether that be so or not, it was wrong for him to put himself in a position where his interest conflicted with Vaughan's. He was trying to serve two masters.

The Circuit Court by inference found that the secret agreement was illegal when it declared that Marnon must account for the commissions received thereunder, and that these, like the other profits of the joint adventure, should be divided equally between the parties. If Marnon and Vaughan were equal partners in a joint adventure it would seem that that disposition of the matter was correct. *Shulkin v. Shulkin,* 301 Mass. 184, 16 N. E. (2d) 644, 118 A. L. R. 629, with annotation at p. 640. But, inasmuch as Marnon was an agent at the time that he entered into the secret agreement, we are of the opinion that he is under a duty to account for all the profits which he derived from it.

▪ The commissions in question were earned in the years 1941, 1942, 1943 and 1944. The defendant's amended and supplemental answer was filed on November 20, 1945, and the further and separate answer therein which alleged the secret agreement is broad enough to require an accounting of such profits for all four years. Notwithstanding this fact, the court limited the recovery in this regard to the two years, 1942 and 1943, for which Marnon sought an accounting. We find no explanation or defense of this procedure in the plaintiff's brief and we do not understand on what theory that limitation can be supported. The defendant's separate answer is an equitable counterclaim the scope of which is defined by § 9-114, O. C. L. A.:

> "The counterclaim of the defendant shall be one upon which a suit might be maintained by the defendant against the plaintiff in the suit; and in addition to the cases specified in the subdivisions of section 1-712, it is sufficient if it be connected with the subject of the suit. * * *"

It is apparent that the defendant was entitled to an

accounting of all the illegal profits, regardless of the year in which they were earned, because they were all without question "connected with the subject of the suit" brought by Marnon.

■ The defendant contends that an agent who enters into a secret agreement of the kind herein question forfeits all right to recover for services rendered on his principal's behalf. There is considerable authority in support of this rule. See *Raymond v. Davies*, 293 Mass. 117, 199 N. E. 321, 102 A. L. R. 1112, and cases cited in the annotation, pp. 1119 et seq. The rule, however, is not an inflexible one, as appears from *Willis v. Van Woy*, 155 Fla. 465, 20 So. (2d) 690, and *Shulkin v. Shulkin,* supra. Partners in the latter case were held to have been guilty of taking secret profits, and it was urged that an agent who is unfaithful to his trust may be denied compensation. The court said that "this rule is not an absolute one and the question whether a fiduciary who has not been entirely faithful will be denied compensation to which he would otherwise be entitled ultimately rests in the discretion of the court." Because the services of the unfaithful partners had been of real value and had resulted in handsome returns on the investment of the other partner, the court held that the rule against allowing compensation in that character of cases ought not to be applied. In view of Marnon's valuable contribution to the success of Mobilift during the war years a like result is indicated here.

■ Although it is disputed by plaintiff's counsel, we think it cannot be doubted that in 1941, when the secret agreement was made, Marnon was an agent, working, as we have held, for an agreed compensation of eight per cent of sales. He was not at that time,

under any definition of joint adventure that we have seen or within the holding of any case to which we have been referred, a joint adventurer with Vaughan, because he did not share in the profits of the business as such, but under his agreement was entitled to his compensation of eight per cent whether there were profits or not. We need go no further than cite our own decision in *Moore v. Willamette Iron & Steel Works,* 127 Or. 134, 271 P. 49, where we held that the plaintiff, an inventor, who had licensed the defendant to manufacture his device under an agreement for a commission on sales made by the plaintiff, was not engaged in a joint adventure with the defendant. The court gave express approval to the holding in *Goodwin v. Camp,* 295 Fed. 785, in a similar case, that there was no joint adventure because ''appellant was paid as compensation for her services fixed commissions upon the gross sales, without reference to whether the business made a profit or suffered a loss, and thus whether there were any net or joint profits to divide.'' See, also, 30 Am. Jur., Joint Adventures, 689, § 24.

■ Marnon was not carried on the books of the Vaughan Motor Company as an employee, either for social security or income tax purposes, and Boutin testified that the Internal Revenue Department advised him that Marnon should be classed as an independent contractor, and the evidence would strongly indicate that he had that status. He himself claimed it on one occasion. But, although an independent contractor, he would still be an agent ''subject to the fiduciary duties of loyalty and obedience to the wishes of the principal''. Restatement, Agency, p. 485, Comment c.

■ Plaintiff seeks to justify the secret profit by the history of the Cain agency. This is a long story, and

it will have to suffice for our purposes to say that Marnon claimed in his testimony that he felt himself obligated to reimburse certain unnamed men with influence in Washington, who had backed Cain financially in the beginning of his efforts to secure government business, and that he, Marnon, proposed to do this out of his half of the Washington commissions. We are not impressed with Marnon's truthfulness in this part of his testimony. But, true or not, it makes no difference, for the rule that the agent who takes a secret profit must account to his principal for such profit, is not diluted by a consideration of the fact that he may have been required to divide the profit with others in order to get it himself. See Restatement, Agency, p. 924, Comment c.

█ The plaintiff also urges in this connection that the defendant refused to pay any part of the expense of procuring the government business and that the plaintiff "drove" Vaughan into providing an adequate plant in supplying the government orders. The first of these propositions, while true, is irrelevant, because Marnon was working under an agreement which required him to pay his own expenses. As to the second, a good deal might be said on the other side. But, whatever the fact may be, it can have no bearing on Marnon's duty of loyalty to his principal.

█ Finally, it is argued that Marnon had "a good and valid reason" for not informing Vaughan of his interest in the Washington agency, namely, that Vaughan had refused to honor his claims theretofore made to profits to which he was entitled under the contract. This refers no doubt to Marnon's claims to unpaid discounts to which, as we have held, he was not entitled. It is suggested that a withholding of funds

from sales—meaning, we assume, Marnon's half of the commissions— "would have precipitated litigation which would have wrecked the business at its inception." For all that anyone can say, if Marnon had informed Vaughan of his agreement with Cain, Vaughan would have approved it. But whether that be so or not is beside the point. Since he did not disclose the facts it was a secret profit, and Marnon must account for it, not primarily to benefit Vaughan or punish Marnon, but rather to vindicate a salutary rule of policy that demands undivided loyalty of an agent to his principal.

## CONCLUSION

The views we have expressed lead to a reversal of the decree, although not a dismissal of the suit. The question—What is "a reasonable margin of profit" to be allowed the plaintiff?—has not been presented to this court, and was not decided in the court below, although the court held originally that that was the measure of the plaintiff's right to relief. We think that the question should be decided by the Circuit Court in the first instance. Counsel should have an opportunity to present their views upon it and may possibly wish to introduce additional evidence. It may be that plaintiff will wish to amend his complaint to conform to the facts proved with respect to the modification of the contract, although we are not entirely satisfied that, notwithstanding the avowed theory of the case, the complaint does not contain allegations sufficient to support a recovery based upon a modification of the contract. The allegation, however, that the defendant "failed, neglected and refused to set a sale price with plaintiff which would allow plaintiff a reasonable margin of profit, according to the terms of

said agreement" is contrary to the proof and should be changed. Plaintiff may also wish to file a supplemental complaint to include a claim for profits earned by him during the part of the year 1944 that he was engaged in selling Mobilifts, particularly as he must account for the 1944 secret profits.

Most of the profits derived from the government business were scaled down in so-called renegotiation proceedings, under wartime legislation. After such renegotiation, the entire amount of the secret profits over the four-year period was $154,135.00. Against this Marnon claimed credits for escrow fees and fees paid to attorneys as expenses necessarily incurred in conducting the renegotiation proceedings. On the argument here the defendant made no objection to the deduction of items of this character from the commissions for which Marnon is required to account. No doubt it was necessary to employ attorneys in the renegotiation proceedings, and the fees paid may properly be regarded as decreasing by so much the amount actually received by Marnon. Of some analogy are the cases of *Forlaw v. Augusta Naval Stores Co.*, 124 Ga. 261, 52 S. E. 898 (see 6th syllabus) and *Judevine v. Town of Hardwick*, 49 Vt. 180, 186. See, also, 3 C. J. S. Agency, 54, § 165.

The defendant does, however, attack the allowance made by the court of one of these fees, claimed to have been paid to Attorney Schall. Our examination of the record on the point convinces us that the fee was actually paid for the purpose stated. The defendant argues that on the hearing the judge refused to consider the claim because he was of the opinion, and so expressed himself, that Marnon was not telling the truth about it. That incident did not relate to the at-

torney's fee in question, payment of which is evidenced by a check from Marnon to Schall in the sum of $9,-600.00, but to other alleged fees which had nothing to do with the renegotiation proceedings. We think the item was properly deducted.

■ The Circuit Court by its decree gave Marnon half of the profits from the Chicago branch. Vaughan challenges this ruling because of Marnon's concession that he was not entitled to share in those profits. But Marnon's concession referred to his claim to the unpaid discounts and the service charges. During the time he was working on the eight per cent commission basis he received eight per cent of the Chicago branch sales, and afterwards Vaughan credited him with four per cent of those sales. In our opinion he is entitled to a "reasonable margin of profit" on that business equally with the rest.

The decree of the Circuit Court is reversed and the cause remanded for further proceedings in conformity to this opinion.

Brand, J., on leave of absence at time case was argued; Winslow, formerly Justice pro tem, did not participate.

On plaintiff's petition for rehearing filed July 28, 1948.

Former opinion filed June 8, 1949. 194 P. (2d) 992.

Petition denied.

LUSK, J.

The plaintiff's petition for rehearing presents nothing new. We gave full consideration to every question which it raises and are not persuaded that we

should change the views announced in the opinion on file.

One proposition stated in the petition, however, calls for comment, as it seems to indicate a misapprehension on the part of counsel of the effect of our decision in one particular. It is said: "The court erred in limiting the accounting between the parties to the time when defendant excluded the plaintiff from business." We had no intention so to limit the accounting, and we do not believe that anything said in the opinion will bear that construction. Under the complaint the plaintiff, by his own allegations, was limited to an accounting of profits earned during the years 1942 and 1943. In remanding the cause for further proceedings we suggested that plaintiff might wish "to file a supplemental complaint to include a claim for profits earned by him during the part of the year 1944 that he was engaged in selling Mobilifts, particularly as he must account for the 1944 secret profits." 194 P. (2d) 992, 1022. This suggestion—and it is no more—does not preclude the plaintiff from asserting any claim that he may have for an accounting of profits earned after he was excluded from the business of selling Mobilifts, or for any other relief to which he may be entitled based upon an alleged wrongful termination of the contract. As to the merits of these matters we express no opinion, since they are not before us under the pleadings or the proof.

The petition for rehearing is denied.