OLD AMERICAN LIFE INS. CO. v. BIGGERS.

No. 3694.

United States Court of Appeals Tenth Circuit.

Feb. 2, 1949.

Rehearing Denied Feb. 24, 1949.

Coleman Hayes, of Oklahoma City, Okl. (George J. Fagin and Monnet, Hayes & Brown, all of Oklahoma City, Okl., on the brief), for appellant.

Rex H. Holden, of Oklahoma City, Okl., for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

The Old American Life Insurance Company[1] instituted this action against Biggers seeking a decree adjudging a contract to be void, or, in the alternative, that it be adjudged to terminate when Biggers had received the amount of $22,443.26 thereunder.

The Insurance Company was organized under an Act known as the Mutual Benefit Act of the State of Oklahoma, 36 Okl.St. 1941 §§ 691–712, under the name of the Duncan Life and Accident Association, Duncan, Oklahoma. From the date of its organization until March, 1929, it operated on a post-mortem assessment plan. In March, 1929, its charter was amended so as to adopt the level rate plan.

Companies organized under such Act operate on a mutual plan. Their premium rates are less than those charged by old line legal reserve insurance companies. No dividends or disbursements of that character are made by such companies.

On August 1, 1935, the Insurance Company entered into a reinsurance contract whereby all of its members, except those composing its board of directors, were reinsured in the Republic Life Insurance Company of Oklahoma City, Oklahoma. This left the Insurance Company with nothing but its charter. In September, 1935, by amendments to the charter, the

---

1 Hereinafter called the Insurance Company.

name was changed to Old American Life Insurance Company, and new officers and directors were elected and installed.

In accordance with a general practice with respect to members of such insurance companies, each member of the Insurance Company, at the time of his application for membership, executed a continuing proxy to the president of the Insurance Company. This gave the president and succeeding presidents the power to elect the boards of directors and thereby control the election of officers. Until such an insurance company had accumulated a reserve, it was the practice of the organizers and promoters to make advances to meet its financial requirements. An insurance company could not obligate itself to repay such advances, because so to do would render it insolvent. But the practice was for the president and other officers, through the control effected as above stated, to reimburse themselves for advances so made, indirectly through salaries and commissions.

In November or December, 1935, Biggers initiated negotiations with R. W. Dockray which resulted in an agreement that Dockray should become sales manager of the Insurance Company; that he should receive a salary of $250 per month and traveling expenses; that he should develop and build up the business of the Insurance Company, and that when he had succeeded in so doing, the benefits flowing from proxy control should go one-third to Dockray, one-third to Biggers, and one-third to D. W. Womack, who was secretary-treasurer of the Insurance Company.

From July, 1935, to September, 1938, H. H. Sharp was the president of the Insurance Company. He was at all times the alter ego of Biggers. Sharp resigned as president in September, 1938. Dockray was vice-president and, as such, apparently performed the duties of president until February, 1940. Biggers' domination of the Insurance Company did not cease with the resignation of Sharp. Until February 13, 1940, he continued his domination through its directors, all of whom, except Dockray, were employees of Biggers. Sometime during February, 1940, probably on February 13, 1940, Dockray was elected president of the Insurance Company.

Dockray told Biggers that considerable funds would have to be advanced to the Insurance Company, and Biggers agreed to make such advances. From time to time, Biggers made advances to the Insurance Company, aggregating $22,443.26. All of such advances were made in the name of Sharp except one of $750.

On January 11, 1938, Sharp signed and delivered a letter to the Insurance Commissioner which stated that the donations made by Sharp to the Insurance Company in the amount of $11,431.67 were, in fact, donations and that the Insurance Company was not liable to repay or reimburse Sharp therefor. On September 15, 1936, Sharp had signed and delivered a letter to the Insurance Commissioner in which he made a like statement with respect to $6,300 advanced by him to the Insurance Company.

Early in 1940, Biggers advised Dockray that he would not advance any more money to the Insurance Company and proposed that its policies be reinsured in the Republic Life Insurance Company. After some discussion of the effect of such action on Biggers and Dockray, Biggers proposed that the Insurance Company enter into a contract whereby it would agree to pay him 10 per cent of the gross premiums received on business then in force, and thereafter written by the Insurance Company, until he had received the amount of $22,443.26. Dockray suggested that the commission on premiums should be 5 per cent. Biggers insisted on 10 per cent and stated he would cause the directors of the Insurance Company to reinsure its policies unless the Insurance Company entered into the contract as demanded by him. Biggers stated that, should the policies be reinsured, he would lose the $22,443.26 he had advanced and Dockray would lose all but the $250 per month he had received as salary. Dockray requested Biggers to recite in the contract the amount of the Insurance Company's liability to him. Biggers replied that that could not be done because it would show a matured liability, but stated that the contract would terminate when he had received $22,443.26 under it.

On February 1, 1940, the Insurance Company entered into a contract with C. J. Bozeman. The contract recited that Bozeman had contributed a large amount of money to the Insurance Company to assist in promoting it and building up its agency force and had made it possible for the Insurance Company to write a substantial amount of business; that Bozeman was willing to release any and all claims he had against the Insurance Company because of such contributions, and was willing to use his influence in securing new business for the Insurance Company and to assist it in retaining business then in force, and that the Insurance Company desired to secure the cooperation of Bozeman in continuing in force the business then on its books, and desired to be relieved of all obligations of whatsoever kind and character which Bozeman might have against it because of such contributions.

It provided that, for and in consideration of $1 paid by Bozeman and the mutual covenant set forth in the contract, Bozeman released the Insurance Company of any and all claims he might have against it because of such contributions; that Bozeman should cooperate with the Insurance Company in writing new business and assist it wherever possible in continuing in force, business then on its books; that the Insurance Company transferred, assigned, and agreed to pay to Bozeman 10 per cent of the gross premiums received by it on all business then in force and which might thereafter be written by it; and, that, should the Insurance Company discontinue writing new business or should it be merged with, or reinsure its policies in, another company, it should continue to pay such percentage of premiums upon all insurance in force at the time of the reinsurance or merger.

When Dockray became president in 1940, he made substantial reduction in salaries of officers and in operating expenses. The Insurance Company prospered. Its net assets increased from $1,101.37 in 1939 to $27,024.87 in 1946.

The Insurance Company paid Biggers $15,460.19 between January 10, 1940, and February 15, 1946.

On March 8, 1946, the Insurance Company made a written offer to pay Biggers $6,983.07, which, with the payments theretofore made, would equal the $22,443.26 donated to the Insurance Company by Biggers, on condition that Biggers return the original of the contract and an assignment thereof to the Insurance Company. Biggers declined so to do and, thereupon, the Insurance Company brought this action.

At the hearing below, Dockray testified that the advances made by Biggers to the Insurance Company were, in fact, donations and did not create any legal liability on the part of the Insurance Company to make repayment thereof. He further testified that before the contract of February 1, 1940, was entered into, Biggers unequivocally agreed that the liability of the Insurance Company under the contract should be $22,443.26, and that when that amount had been paid to Biggers thereunder, the contract would terminate. That testimony was not denied.

One ground set up in the complaint for the relief sought was that the consideration moving from Biggers was insufficient to support an agreement by the Insurance Company to pay Biggers 10 per cent of the gross premiums received by the Insurance Company throughout its life.

The trial court denied the plaintiffs any relief and awarded Biggers judgment on his counterclaim for the amount of commission which had accrued under the contract, with interest. The Insurance Company has appealed.

■ It is clear that Bozeman did not render to the Insurance Company any of the personal services provided for in the contract. We think it may be reasonably inferred from the evidence that Biggers did not render the Insurance Company any personal service under the contract. In fact, counsel for Biggers states in his brief that the parties did not contemplate that any of such services would be rendered.

The Insurance Company contends that, since no limitation as to time is expressed in the contract, either it is terminable at the will of either party, or it will terminate at the time when the parties intended it should cease to operate.

We do not think the contract should be regarded as one for personal services and, therefore, terminable by either party on reasonable notice.[2]

■ The parties did not contemplate that either Biggers or Bozeman would render any personal services under the contract. The advances which Biggers had made to the Insurance Company were donations and created no express or implied legal obligation of the Insurance Company to repay them. The release by Biggers of any claim which Biggers had against the Insurance Company for such donations did not constitute a legal consideration for the contract, because the relinquishment of a claim which is wholly without merit or foundation does not constitute a legal consideration.[3] The giving up by Biggers of the control he had exercised over the Insurance Company was not a lawful consideration. Control vested in the president of the Company because he held the proxies of all of its members and could cast a controlling vote at annual meetings and in the election of boards of directors. But one acting as president occupied the relation of a fiduciary to the Insurance Company,[4] and a president, in voting as the proxy for members, occupies the relation of a fiduciary to such members.[5] Surely, the fiduciary powers vested in a president of a corporation and in one authorized to act as proxy for a member cannot be bartered or sold. Neither can they be transferred as the consideration for a contract. The control and domination of the Insurance Company by Biggers, up to the time the contract was entered into, does not enhance his position with respect to his rights to enforce the contract. It follows that the contract must be supported, if at all, by the moral obligation which arose from the donations made by Biggers. We think it may be said that, while it was not intended that such donations should create a legal obligation on the part of the Insurance Company to repay them, Biggers expected that, if the Insurance Company prospered, through the control he was able to exercise over it, he would eventually be indirectly repaid through the payment of salaries or commissions. Made under those circumstances, we think the donations created a moral obligation on the part of the Insurance Company sufficient to support a future executory promise.

■ While the authorities are not in agreement, the trend of modern authorities is to the effect that where services or other consideration moving from the promisee conferred an actual, material, or pecuniary benefit on the promisor, and not merely a detriment to the promisee, and the promisee expected to be compensated therefor and did not intend it as mere gift or gratuity, and the benefit received had not constituted the consideration for another promise already performed or still legally enforceable, a moral obligation arises which will support a subsequent executory promise where there was originally no contract, perfect or imperfect, obligating the promisor.[6]

By statute, Oklahoma has recognized, without defining, a moral obligation as a consideration for a promise and has limited the extent to which it can constitute a consideration for a promise. 15 Okl.St. Ann. § 107 provides: "An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a

---

[2] Cf. Dunn v. Birmingham Stove & Range Co., 170 Okl. 452, 44 P.2d 88.

[3] Hulen v. Truitt, 188 Okl. 296, 108 P. 2d 170, 173.

[4] Dunnett v. Arn, 10 Cir., 71 F.2d 912, 918; Fletcher Cyc.Corp.Perm.Ed. Vol. 3, § 838, pp. 142, 144.

[5] Carcaba v. McNair, 5 Cir., 68 F.2d 795, 797; Cliffs Corporation v. United States, 6 Cir., 103 F.2d 77, 80; Wolcott & Lincoln v. Butler, 155 Kan. 105, 122 P.2d 720, 723, 141 A.L.R. 356.

[6] Park Falls State Bank v. Fordyce, 206 Wis. 628, 238 N.W. 516, 518, 519, 79 A. L.R. 1339; Holland v. Martinson, 119 Kan. 43, 237 P. 902, 903; Webb v. McGowin, 27 Ala.App. 82, 168 So. 196, 198; Id., 232 Ala. 374, 168 So. 199; Edson v. Poppe, 24 S.D. 466, 124 N.W. 441, 26 L.R.A.,N.S., 534; Notes 17 A.L.R. pp. 1359, et sequi, and 1317, et sequi; 25 A.L.R. p. 635; 79 A.L.R. pp. 1353 and 1350; 12 Am.Jur. p. 601, § 107; 17 C. J.S., Contracts, § 118, p. 471.

good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."

We, therefore, conclude that the donation made by Biggers to the Insurance Company constituted a consideration in the nature of a moral obligation for the promise of the Insurance Company to pay Biggers 10 per cent of its gross premiums, but only to the extent of such obligation and no further,[7] and that, when payments made under the contract equal the amount of the donations, the contract will terminate.

The judgment is reversed and the cause remanded for further proceedings in accordance with this opinion.

---

[7] Kennedy v. Marshall, 195 Okl. 617, 160 P.2d 397, is not to the contrary. There, the donations were naked gifts with no expectation that there would be reimbursement therefor in the future.