Earl E. STAMPER, Plaintiff in Error,

v.

John S. GAMMILL and Reserve National Insurance Company, Defendants in Error.

No. 38764.

Supreme Court of Oklahoma.

Aug. 2, 1960.

John A. Johnson, of Savage, Gibson, Benefield & Shelton, Oklahoma City, for plaintiff in error.

George Miller, Jr., and Floyd L. Martin, Jr., of Miller, Adams & Rogers, Oklahoma City, for defendants in error.

BLACKBIRD, Justice.

Plaintiff in error, an alleged former Sales Director for a life, health and accident insurance company, at a monthly salary of $700, brought this action, as plaintiff, against defendants in error, and other parties unnecessary to mention, as defendants, for funds allegedly due him after he resigned said former position in 1957, to become associated, under contract, with the defendant John S. Gammill in operating a new mutual insurance company, called Reserve National Insurance Company.

Under this contract entered into by and between plaintiff and Gammill, it was agreed that the Oklahoma City building, in which Gammill Printing Shop was located, would be transferred to the new insurance company for a consideration of $105,000 to be paid by it to Gammill. It was also agreed that plaintiff would "accept" the position of Executive Vice-President of the new company, at a salary to be set by the Company's board of directors. The contract contemplated that Gammill would contribute private funds to the company's expenses, with indebtedness certificates bearing 6% interest, payable to the Company, being issued each month to him, equal to such amounts and other funds that might be withdrawn from the company by plaintiff.

By the contract, it was also agreed to change the Company from a mutual, to a legal reserve stock, or stipulated premium, Company, as soon as financially able, and in the event additional capital and/or surplus was then needed, such additonal amounts over and above the assets of the company at that time, would "be determined" in the "proportionate" percentages of 65% to Gammill, and 35% "to" plaintiff. In consideration for Gammill's agreement "to convey" plaintiff the 35% of "such control and interest" as Gammill might have, plaintiff agreed to pay Gammill $7,000; and further agreed that he would not resell any such interest prior to February 15, 1960.

The contract also provided that " * * * if any disagreement may arise between" the parties, Gammill agreed to buy, and plaintiff agreed to sell, his interest to Gammill for $7,000, less any indebtedness he owed Gammill.

In the Amended Petition, he filed in this action, plaintiff alleged, in substance, that, when he became associated with the defendant company under the above-described contract, and delivered to Gammill his promissory note for the $7,000 specified in said contract—but with the understanding that said note would be payable only from plaintiff's share of the defendant company's net profits, distributed in salary form—the company was operating at a financial loss, and for that reason, he thereafter drew a monthly salary of only $200, instead of the $700 earned in his former employment.

Plaintiff further alleged, among other things, in substance, that in November, 1958, by reason of his almost two years of service to it, the defendant Company was realizing a gross profit. The allegations of the Amended Petition clearly showed that, despite this, the defendant Gammill not only never transferred to plaintiff the 35% interest contemplated in the con-

tract, but that in accord with a design formulated by Gammill to dispense with plaintiff, after receiving benefit and profits from his expert services, the aforesaid contract was breached by Gammill's feigning "disagreement" between the two, and, on that purported ground, attempting to terminate his connection with the company under the above-quoted contract provision.

Reference was made in the Amended Petition to a letter (copied and attached to it as Exhibit "B"), which Gammill wrote plaintiff on December 11, 1958, in which, after quoting the above-described contract provision with reference to the purchase of plaintiff's interest, Gammill asserted his right, and expressed his intention, to buy "such interest" as plaintiff acquired under said contract. Among other things, the letter also set forth a purported statement of the interest accruals, as well as credits given, on plaintiff's $7,000 note held by Gammill, and offered, upon plaintiff's payment to Gammill of the difference between these, in the amount of $271.78, to mark said note paid and surrender it to plaintiff.

The Amended Petition further alleged, that at a meeting on December 12, 1958, of the Company's "nominal" Board of Directors, named and controlled by Gammill, plaintiff was "summarily and unjustifiably" discharged.

While the Amended Petition specifically concedes that "Gammill did not personally own and could not convey the assets" of the defendant company "* * * while it remained in corporate form * * *", it quotes a provision printed into the Company's applications for insurance, by which all "policyholder-members" had given Gammill, or his successor as President of the Company, their voting proxies for meetings of the Company's members "* * * unless otherwise ordered * * *" by them "in writing sixty days prior to such meeting." On the basis of this, the Amended Petition asserted that Gammill's "absolute proxy control and power of distribution" of the Company's income, when

earned, "created in plaintiff the reasonable expectation "of ownership of, and profits from, a "35% stock interest" in the defendant company at "such time as * * * (it) * * * should be financially able to be converted to a stock company."

In the Amended Petition's so-called "First Count", in which the recovery sought was damages for defendant's alleged breach of the "employment features" of the above-described contract, plaintiff prayed for alternative relief. He first asked for $60,000 as the amount he would have received under this contract, if it had not been breached, less the indebtedness represented by his $7,000 note to Gammill. In the alternative he prayed for a total of $11,000, computed by multiplying the $500 per month difference between the salary he had received, and the $700 salary of his former employment, by 22, which was the number of months he allegedly worked for the defendant company under the subject contract.

The cause of action plaintiff attempted to allege under the "Second Count" of his Amended Petition was based upon the asserted theory that, by reason of the alleged facts, there had been created a constructive trust with the 35% interest specified in the subject contract for plaintiff, as the trust res and plaintiff's being the cestui que trust.

The trial court sustained separate demurrers filed on behalf of Gammill and the insurance company; and, when plaintiff elected to stand on his Amended Petition, entered judgment dismissing the action. It is from said judgment plaintiff has perfected the present appeal.

In his argument for reversal of the trial court's judgment, plaintiff attempts to demonstrate that his Amended Petition stated two good causes of action. He says that the members, or those holding "stock" interests, in a mutual insurance company, like the defendant company, do not participate in the company's profit by receiving dividends. He characterizes the defendants as co-trustees for such members, however, but argues that his and Gammill's contract

made them participants in a joint venture, as far as company profits were concerned, and created between them a fiduciary relationship. On the basis of this relationship, he maintains that defendants were co-trustees for him, as well as the policyholding-members of the company, and that the subject contract bound said defendant to continue plaintiff's employment as the Company's Executive Vice-President and to transfer to him a 35% "stock interest" in the defendant company. Plaintiff concedes that Gammill did not own the physical assets of the defendant corporation, but represents that Gammill's holding of all of the corporation's members' voting proxies, allowed him to select the members of its board of directors and thus control the business's operation and its distribution of profits when earned. Plaintiff admits he was never a member of the corporation and held no title to any of its physical assets. He says: "The 'property' involved in the joint venture was Gammill's power and control."

One of defendant's answers to plaintiff's argument is that it is plain from his Amended Petition, and brief, that the causes of action he attempted to allege are based upon an agreement contemplating the sale, to plaintiff, of Gammill's power, as the defendant Company's President, to control its operations and the distribution of its profits. They take the position that such a corporation president's promise to distribute the corporation's profits, or to continue a person in its employ indefinitely, by exercising such so-called control, is invalid and unenforceable. They cite Old American Life Insurance v. Biggers, 10 Cir., 172 F.2d 495, 499, 8 A.L.R.2d 781, in which the court held:

> " * * * the fiduciary powers vested in a president of a corporation and in one authorized to act as proxy for a member cannot be bartered or sold. Neither can they be transferred as the consideration for a contract."

To the same effect is Sauerhering v. Rueping, 137 Wis. 407, 119 N.W. 184, also cited by defendants. There, it was demonstrated,

that the attempted binding of company officials by private contract, to do things affecting the company's operations, without respect to its welfare, is illegal, because it places them in a position where their obligations under the contract may be antagonistic, or incompatible, to the best interests of the company, and/or its members, and the duties they owe them.

In the present case, we think the contract provisions, upon which both counts of plaintiff's Amended Petition are based, are unenforceable, not only because such attempted bartering away of Gammill's control of the defendant company, through his voting proxies from its members, was illegal and against public policy (Reed v. Catlett, 228 Mo.App. 109, 68 S.W.2d 734, 736); but they were also unenforceable because such power, by the wording of the proxies themselves, was subject to being diminished, if not entirely wiped out, by the proxies' withdrawal "sixty days prior" to members' meetings. We agree with defendants that since the subject provisions were illegal, the contract would support neither of the causes of action plaintiff attempted to allege. The trial court therefore committed no error in sustaining defendants' demurrers to plaintiff's said pleadings, and, upon his election to stand thereon, in entering judgment dismissing the action. Said judgment is therefore affirmed.

WILLIAMS, V. C. J., and WELCH, JOHNSON and JACKSON, JJ., concur.

DAVISON, C. J., and IRWIN and BERRY, JJ., dissent.

BERRY, Justice (dissenting).

I am unable to agree with the majority opinion.

It is stated in substance in Stamper's amended petition that the Reserve National Insurance Company is a mutual insurance company; that the policy-holders do not participate in profits earned by said company and that the profits earned inure to the benefit of Gammill because of his control of the company.

Stamper contends that his contract with Gammill should be construed as providing that he (Stamper) should receive 35% of the profits and not 35% of the intangible right to control the company which rested in Gammill because of proxies granted to Gammill by policy-holders. As I understand the facts, the person controlling the company had the right to name company's board of directors and therefore control the policies of the company. It also included the right to take "profits" earned by the company.

It is a matter of common knowledge that a person who controls by stock ownership, proxies, or otherwise, more than 50% of the voting rights in a corporation controls the corporation. In view of the fact that 35% ownership in Stamper would not give him "control" of the company, it cannot be logically argued that in using the language "First Party (Gammill) agrees to convey to Party of the Second Part (Stamper) Thirty-five (35%) percent of such control and interest that (Gammill) may have in the" company, it was intended that Stamper should have any measure of control of the company. To the contrary, it must be said that in using the phrase "control and interest" in the contract the parties were referring to an "interest" and right which Gammill could assign and which Stamper could enjoy. The interest and property right which Gammill owned and which he could lawfully assign was 35% of the profits accruing to him because of his "control and interest" in the company. The fact that services to be rendered and which were rendered by Gammill constituted a lawful consideration for said promise is free from doubt. In brief, I am of the opinion that under the facts the word "control" should not be singled out and held to establish that the parties intended that Gammill transfer and assign to Stamper something that he could not lawfully sell and assign; that the word "interest" should be given consideration in arriving at the intent of the parties and when the phrase "control and interest" is construed in the light of the facts, it must

be said that the parties agreed that Gammill should assign to Stamper 35% of a property right consisting of profits which the former owned and as owner could properly assign.

By force of Statute 15 O.S.1951 § 159, "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties." The cited statute is consonant with the common-law rule that a contract capable of an interpretation which will make it valid or legal will be given such interpretation. 12 Am.Jur. "Contracts", Sec. 251, p. 793.

In Griffin v. Patterson et al., 183 Okl. 108, 80 P.2d 246, this is said in the first paragraph of the syllabus:

"An agreement by officers and directors of a mutual benefit insurance association to resign their positions and place others in their stead, for a monetary consideration, is void as against public policy; but, where there is some competent evidence reasonably tending to show that a contract by such officers to sell the office equipment and perform 'certain services' did not contemplate such acts as a part of the consideration, it is not error to overrule a demurrer to the evidence and motion for directed verdict interposed by the party asserting such illegality."

To my way of thinking, it is to be remembered that the contract contemplates (1) payment of 35% of profits received by Gammill because of his control and interest in the mutual insurance company, and (2) that said company be converted to a legal reserve company or a stipulated premium company "as soon as financially able", and that Stamper have a 35% interest in the reorganized company. It is apparent that Gammill did not agree to assign 35% of his control in a "reserve stock company or a stipulated premium company" to Stamper because said companies were not in existence when the contract in controversy was entered into and it must be assumed that proxies that were granted by

the policy-holders in the mutual company would not give Gammill "control" of the company to be formed. To the contrary, I assume that (1) property rights would come into the hands of the organizer of such a company which could be lawfully assigned or (2) if the rights to profits would depend upon proxies granted by policy-holders in the new company, 35% of the proxies could be granted by policy-holders in the new company to Stamper and 65% to Gammill. In either event, the contract in this particular would be lawful.

I am of the opinion that that portion of the contract above referred to represents a promise on Gammill's part that is not necessarily connected with the promise first herein referred to. I refer to the fact that Gammill promised (1) to assign to Stamper either 35% of either the control or profits accruing from the mutual company in consideration of Stamper's $7,000 promissory note and services to be rendered by Stamper, and (2) to assign to Stamper a 35% interest in a reorganized company in consideration of services rendered and to be rendered by Stamper, and a cash consideration of $105,000 payable to Gammill for property which was to be transferred by Gammill to Stamper in the reorganized company. The consideration moving between the parties in connection with the last referred-to portion of the contract was lawful. Therefore, assuming that the first referred-to portion of the contract is unlawful (which I refuse to assume for reasons given), I am nevertheless of the opinion that the last referred-to portion of the contract represents an enforceable obligation on Gammill's part. At p. 737, Sec 220, 12 Am.Jur. "Contracts", this is said:

"A distinction is made between the cases in which the consideration is illegal in part and those in which the promises founded on the consideration are illegal in part. If the consideration is valid, an agreement containing more than one promise is not necessarily rendered invalid by the illegality of one of the promises, at least if such promise is not immoral. In fact, it

has been stated that where two promises, one of which is illegal, are made upon a lawful consideration, the promise which is unobjectionable is ordinarily held to be enforceable. * * *"

For reasons stated, I respectfully dissent to the majority opinion.