**GUARANTY BANK (SOUTH OAK CLIFF BANK), Appellant,**

v.

**NATIONAL SURETY CORPORATION, Appellee.**

No. 18245.

Court of Civil Appeals of Texas, Dallas.

March 21, 1974.

Rehearing Denied April 11, 1974.

Royal H. Brin, Jr., Strasburger, Price, Kelton, Martin & Unis, Dallas, for appellant.

James K. Allen, Allen, Bowles & Davis, Dallas, for appellee.

GUITTARD, Justice.

In this suit for interference with business relations the trial court rendered summary judgment for defendant. We affirm on the ground that plaintiff had no legally protected interest because the transaction with which defendant is alleged to have interfered would have involved a misappropriation of trust funds.

The controversy arose out of difficulties in construction of a low-income housing project for a non-profit organization known as Calvary Arms Charitable Trust. The named beneficiary of the Trust was Mount Calvary Baptist Church, and its pastor, Reverend R. N. Bell, was chairman of the board of trustees. Prudential Insurance Company had advanced funds to the Trust on a preliminary loan for construction costs and had also committed itself for a permanent loan on completion of the project. The Federal Housing Administration agreed to insure the full amount of this loan. At the insistence of Reverend Bell, the general contractor sublet the carpentry work to Lee Rabon. When Rabon experienced financial difficulty, Reverend Bell assisted him in obtaining loans from plaintiff bank, and for that purpose personally signed Rabon's notes. Even with this help, Rabon was unable to perform, and he assigned his subcontract to the bank, which undertook to complete it. The bank found

that the subcontract had been substantially underbid, and it ultimately lost $93,501.42, including $42,140.52 which it had advanced to the insolvent Rabon on notes jointly signed by Rabon and Reverend Bell. It failed, however, to complete the subcontract, and the general contractor had to take over the carpentry work. The general contractor completed the entire project at a loss of more than two hundred thousand dollars with assistance from defendant National Surety Corporation, the surety on its performance and payment bonds, and assigned to National Surety all payments remaining on the general contract.

Meanwhile, Reverend Bell, purporting to act for the Trust, applied to Prudential and FHA for a supplemental loan to be used for reimbursing the bank for its loss and paying other obligations Bell had incurred in his efforts to assist Rabon. The bank's representatives had proposed such a loan to Reverend Bell, and they assisted him with the application and supplied information to FHA concerning costs and expenditures. FHA agreed to insure this supplemental loan, and Prudential issued a commitment to lend the Trust an additional $117,700 to be secured, like the main loan, by a mortgage on the property of the Trust. The necessary papers were prepared, and representatives of the Trust, the general contractor, National Surety, and Prudential met in the FHA office for the purpose of closing both loans. The attorney for Prudential brought with him several checks. One check represented the balance due on the original contract, most of which was due to National Surety as assignee of the general contractor. Two other checks aggregated $117,700 the amount of the supplemental loan.

At this meeting James Knox, who was attorney for National Surety and acted also as counsel for the general contractor, raised questions concerning the supplemental loan and would not permit anyone to sign any documents on behalf of the contractor. After some discussion, the meeting broke up without any documents being signed and without any checks being delivered. National Surety's objections continued until FHA withdrew its commitment to insure the supplemental loan and Prudential cancelled its commitment for the supplemental loan. National Surety then withdrew its objections to closing the original loan, which was soon closed with cooperation of National Surety and the general contractor. The supplemental loan was never closed and the bank never received its expected reimbursement. In a separate suit the bank recovered judgment against Reverend Bell for the amount of his liability on Rabon's notes, but apparently that judgment has never been satisfied. In the present suit the bank seeks damages in tort as assignees of the Trust for the amount of the supplemental loan, and, alternatively, for damages in the amount of its own loss of $93,501.42 on the carpentry subcontract. On defendant's motion the trial court rendered summary judgment denying any recovery, and the bank appeals.

One of the grounds of National Surety's motion for summary judgment was that the supplemental loan would have been illegal because it would have involved a misappropriation of trust funds and a conflict of interests on the part of Reverend Bell in view of the provision in the trust instrument that "no part of the income or assets of the TRUST shall be distributed to or inure to the benefit of any individual." The bank contends that although the Trust might have had no legal obligation to reimburse the bank or to relieve Reverend Bell from his personal liability, it would not have acted unlawfully in doing so because the purpose of the Trust was to further minority interests and Rabon, whom Bell had recommended to the general contractor, was a black subcontractor. The bank argues that when Rabon ran into financial difficulty as a result of underbidding the carpentry subcontract, Reverend Bell obtained no personal benefit from signing Rabon's notes but did so in the interest of the Trust so that the project could be moved toward completion and that

this assistance and the further sums advanced by the bank resulted in benefits to the trust property, which the trustees could properly recognize as imposing a moral obligation to prevent loss to the bank and others who had advanced funds to the subcontractor.

In support of this argument the bank relies on authorities holding that a moral obligation arising from a past legal obligation may be sufficient consideration for a subsequent promise to pay a debt barred by limitation or bankruptcy. *See* Hoya v. Self, 245 S.W. 424 (Tex.Com.App.1922, jdgmt. adopted); Flex v. Houston Bank & Trust Co., 489 S.W.2d 126 (Tex.Civ.App. —Houston [14th Dist.] 1972, no writ); Miller v. Aaron, 413 S.W.2d 426 (Tex. Civ.App.—Dallas 1967, writ ref'd n. r. e.); Simpson v. Williams Rural High School Dist., 153 S.W.2d 852 (Tex.Civ.App.— Amarillo 1941, writ ref'd), and Armstrong v. City Nat. Bank, 16 S.W.2d 954 (Tex.Civ. App.—Galveston 1929) cert. denied, 281 U.S. 737, 50 S.Ct. 333, 74 L.Ed. 1152. No such past legal obligation existed in the present case as a basis for the alleged moral obligation. According to some authorities, a past legal obligation is not essential if the promisor has previously received from the promisee a material benefit not intended to be gratuitous. Old American Life Ins. Co. v. Biggers, 172 F.2d 495, 8 A.L.R.2d 781 (10th Cir. 1949); Edson v. Poppe, 24 S.D. 466, 124 N.W. 441 (1910); Park Falls State Bank v. Fordyce, 206 Wis. 628, 238 N.W. 516, 79 A.L.R. 1339 (1931). Those authorities, however, do not support the bank's position here because in order for a moral obligation arising from a past benefit to be recognized as consideration for an executory promise, the past benefit must not have constituted the consideration for another promise already performed or still legally enforceable. Shear Co. v. Harrington, 266 S.W. 554 (Tex.Civ.App.—Waco 1924, no writ); Marnon v. Vaughan Motor Co., 184 Or. 103, 194 P.2d 992 (1948); 1A A. Corbin, Contracts § 235 (1963).

■ In this case full performance of the carpentry subcontract was a benefit to which the Trust was already entitled as part of the consideration for its obligation to the general contractor, and the bank's loss over and above the funds lent to the subcontractor was incurred in the performance of the subcontract for which it had assumed responsibility to the general contractor and for which the general contractor was responsible to the Trust. Consequently, completion of the carpentry work was not a benefit which the law recognizes as imposing on the Trust a moral obligation sufficient to justify payment of trust funds to the bank and others to whom Reverend Bell had incurred liabilities in his attempts to assist the carpentry subcontractor. In the absence of such justification, the diversion of trust funds would have been a breach of trust and, therefore, illegal as against public policy.

This conclusion is not affected by the fact that the subcontractor was a member of a minority race or that the purpose of the Trust was to aid minorities. The beneficiary named in the trust instrument was Mount Calvary Baptist Church, and although the tenants of the housing project may also be considered beneficiaries, nothing in the trust instrument or elsewhere in this record warrants an inference that the charitable purpose extended to providing pecuniary benefits for subcontractors over and above the amounts provided in their contracts, even though they may have been members of a minority race.

Although most of the authorities concerning moral obligations discuss the sufficiency of such an obligation as consideration for an executory promise, the same principle applies to a payment by a fiduciary, as recognized in Park Falls State Bank v. Fordyce, 206 Wis. 628, 238 N.W. 516, 79 A.L.R. 1339 (1931). That was a suit by a bank to rescind a transaction by which the bank had taken over certain notes from a director, and the defense was that the transaction was supported by the moral consideration of a ben-

efit previously received by the bank. Defendant argued that the cases holding that a moral consideration will not support a promise had no application to executed promises. In rejecting this contention, the Supreme Court of Wisconsin said:

> This is true as a general proposition between natural persons acting in their own behalf. A natural person, not standing in the relation of a trustee, may make a gift if he wants to. But a trustee may not make a gift of trust property, nor may the officers of a bank make a gift of its funds; and if either be done, no reason is perceived why action will not lie for rescission and recovery.

■ The illegality of the transaction is aggravated by Reverend Bell's conflict of interests. His efforts to aid the carpentry subcontractor cannot be considered as moving the project toward completion for the benefit of the Trust. If the subcontractor was unable to perform, the responsibility for the carpentry work rested on the general contractor, whose obligation to the Trust was secured by the bonds signed by National Surety. The bank points to no evidence indicating that the project would have been delayed if the general contractor had been required to take over the carpentry work when Rabon first ran into difficulty. Ultimately the general contractor had to complete the carpentry work anyway, since the subcontract was not completed by either Rabon or the bank. Reverend Bell testified that he became involved because Rabon was a black subcontractor whom he had urged the general contractor to hire and Rabon had run into financial difficulties. However unselfish may have been his action in signing Rabon's notes, there is no evidence that he did so for the benefit of the Trust, and he did not purport to act by its authority. He incurred the liability personally, and that personal liability created a conflict between his personal interest and his responsibility as trustee when the bank proposed that he make an application on behalf of the Trust for a supplemental loan for the purpose of relieving his personal liability. Such a loan would have been clearly adverse to the interests of the Trust, since the Trust would not have received the funds, but would have had the obligation to repay the loan. Even though the other trustees may have consented to the supplemental loan with full knowledge of the circumstances and no deception was practiced on anyone, Reverend Bell's participation in the closing of the supplemental loan would have constituted a breach of his duty as trustee, and therefore, would have been illegal. MacDonald v. Follett, 142 Tex. 616, 180 S.W. 2d 334, 338 (1944); Langford v. Shamburger, 417 S.W.2d 438, 444 (Tex.Civ.App.— Fort Worth 1967, writ ref'd n. r. e.); Hendricks v. Wall, 277 S.W. 207, 209 (Tex.Civ.App.—El Paso 1925, writ ref'd); 6A A. Corbin, Contracts § 1456 (1962). The bank had knowledge of these facts, since its representatives suggested the supplemental loan and participated in the negotiations. Consequently, its receipt of a part of the proceeds of the loan would also have been illegal. Wichita Royalty Co. v. City Nat. Bank, 127 Tex. 158, 89 S.W.2d 394, 399 (1935).

■ We cannot ignore the illegality of the transaction on the theory that National Surety as an interfering third person has no standing to raise this question. Such cases as Clements v. Withers, 437 S. W.2d 818. (Tex.1969), and Yarber v. Iglehart, 264 S.W.2d 474 (Tex.Civ.App.—Dallas 1953, no writ), cited by the bank, hold only that a third person has no right to interfere with performance of an oral contract for sale of land because the performance of such a contract is neither illegal nor against public policy. The same rule cannot be applied to a contract which is affirmatively illegal because it involves a misappropriation of trust funds. Neither does this case fall within the rule that a third person sued for interference with performance of a contract cannot defend on the ground that the contract was induced by fraud, as held in Robey v. Sun Record Co., 242 F.2d 684 (5th Cir. 1957) and Beekman v. Marsters, 195 Mass. 205, 80 N.E. 817 (1907). Performance of a

contract induced by fraud is not illegal. Such a contract is only voidable at the election of the defrauded party, who may elect to affirm the contract and in that event may either waive the fraud or sue for his own resulting damages. An interferer has no standing to elect for him. On the other hand, interference with an affirmatively illegal act is not a tort for which damages may be recovered because it does not impinge upon any legally protected interest. The law affords no compensation to a wrongdoer for interference with his illegal gain. Since we conclude from the undisputed facts that distribution of the proceeds of the loan to the bank and others to whom Reverend Bell was obligated would have amounted to misappropriation of trust funds, we hold that as a matter of law neither the Trust nor the bank had a legally protected interest which would support an action for damages. Consequently, the trial court correctly rendered summary judgment for defendant.

Appellee National Surety's motion for rehearing is granted, our former opinion is withdrawn, our former judgment is set aside, and the judgment of the trial court is affirmed.